TEXACO, INC., Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

The B. F. GOODRICH COMPANY, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

Nos. 17915, 17923.

United States Court of Appeals District of Columbia Circuit.

Argued April 10, 1964.

Decided·July 30, 1964.

---

Mr. Milton Handler, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, New York City, with whom Messrs. James O. Sullivan and Frederick W. P. Lorenzen, New York City, were on the brief, for petitioner in No. 17,915.

Mr. Edgar E. Barton, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, New York City, for petitioner in No. 17,923.

Mr. John F. Doyle, Washington, D. C., also entered an appearance for petitioner in No. 17,923.

Mr. Alvin L. Berman, Atty., Federal Trade Commission, with whom Messrs. James McI. Henderson, Gen. Counsel, and Louis Russell Harding, Atty., Federal Trade Commission, were on the brief, for respondent in Nos. 17,915 and 17,923.

Before WILBUR K. MILLER, WASHINGTON and BURGER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

Texaco, Inc. (formerly The Texas Company) and The B. F. Goodrich Company have filed separate petitions for review of an order of the Federal Trade Commission which was issued April 15, 1963, after proceedings which will be described. The cases were heard together and will be disposed of in a single opinion.

On January 11, 1956, after an investigation which began at least as early as 1952, the Federal Trade Commission issued a complaint against the petitioners charging them with violating Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, by engaging in unfair methods of competition in interstate commerce. Specifically, the object of the Commission's attack was the implementation of a contract between the two companies, entered into in 1940, in which Texaco undertook, in return for a commission, to promote the sale of Goodrich tires, batteries and accessories (TBA) to its thousands of dealers in its petroleum products. It was alleged that Texaco has entered into a similar contract with Firestone Tire & Rubber Company.

The complaint stated that influence and control over the purchasing and marketing activities of its dealers has been and is being exercised by Texaco "by recommending, urging, persuading and causing them to purchase a substantial quantity of TBA products from Goodrich and Firestone, the sellers designated by it." The acts and practices of Goodrich and Texaco under the commission contract, the complaint said,

"* * * have unduly frustrated, hindered, suppressed, lessened, restrained, prevented and eliminated competition in the sale of TBA products in commerce within the intent and meaning of the Federal Trade Commission Act; have the capacity and tendency to restrain unreasonably and have restrained unreasonably such commerce in said products; and constitute unfair methods of competition and unfair acts and practices, in commerce, within the intent and meaning of Section 5 of the Federal Trade Commission Act."

Essentially, the complaint was that Texaco coerces its dealers, through economic pressure, to distribute Goodrich TBA and thus unfairly and unlawfully prevents Goodrich's competitors from selling TBA to Texaco's outlets.

Answers by the companies placed the essential allegations of the complaint in issue, after which evidentiary hearings were conducted over a period of nearly three years. They were concluded December 10, 1958. The examiner, in his initial decision issued October 23, 1959, found that Goodrich had not done anything to force Texaco outlets to buy its products; that there was neither charge nor proof that Goodrich had conspired with Texaco to restrain competition; and that the commissions paid by it under the contract were for substantial services rendered by Texaco in promoting the sale of its products. Accordingly, the initial

decision of October 23, 1959, dismissed the complaint against Goodrich.

With respect to Texaco, the examiner found that the contracts between Texaco and its dealers do not contain any provision requiring the latter to purchase only Goodrich TBA. He said the commission paid to Texaco by Goodrich is based on substantial services rendered by Texaco in promoting the sale of Goodrich TBA, and added:

> "No inference or implication can be drawn, simply from the contractual relationship between Texas and its dealers, that the degree of control by Texas over its dealers is sufficient to force its dealers to purchase only sponsored TBA."

The examiner found, however, that

> " * * * the record in this proceeding *as a whole* indicates that coercion and pressure was [*sic*], in fact, brought on *a substantial number of dealers* to induce them to purchase sponsored TBA and to discontinue the purchase or display of non-sponsored items." [1] (Emphasis supplied.)

Pursuant to this, the examiner's initial decision of October 23, 1959, ordered Texaco to cease and desist from coercing its dealers into purchasing TBA from any particular supplier.

In keeping with the deliberate progress of this proceeding, the Commission did not act on the initial decision of October 23, 1959, until March 9, 1961. On that day it handed down an opinion in which it not only reversed the examiner's dismissal of Goodrich but also found

> " * * * that Texaco had sufficient economic power over its wholesale and retail petroleum distributors to cause them to purchase substantial amounts of sponsored

TBA even without the use of overt coercive tactics * * * "

Proceeding from its assumption that Texaco had controlling economic power over its dealers, "even without the use of overt coercive tactics," the Commission said:

> " * * * The determination of whether Texaco's exercise of such economic power in favor of Firestone and Goodyear under the oil company's sales commission contracts with these rubber companies constitutes an unfair method of competition depends, therefore, upon *the competitive effects* of these sales commission contracts; not upon whether Texaco has exercised its power to implement such contracts through the use of overt coercive tactics, or by more subtle, but equally effective, means.

> "At issue in this litigation, then, is the legality of a particular method of distributing TBA used by respondents. A key fact in evaluating the competitive effects of respondents' use of the sales commission method of distributing TBA is the fact that Texaco has sufficient economic power with respect to its retail and wholesale petroleum distributors to cause them to purchase substantial quantities of the brand of TBA sponsored or sold by Texaco. But such economic power is a fact existing independently of any particular method of distributing TBA which Texaco may use. Whether the sales commission agreements between Firestone and Texaco and Goodrich and Texaco are unlawful must depend, therefore, upon the characteristics and the competitive effects of these sales commission agreements. For reasons set forth

---

1. This was a rather extraordinary conclusion in view of the fact that not one of Texaco's more than 38,000 dealers was called to testify before the examiner in support of the complaint. The examiner based the statement on the testi- mony of five former Texaco dealers who said they had been coerced, although five other former dealers and 54 active dealers called by Texaco said they had never been coerced or influenced in any way as to Goodrich TBA.

hereinafter, we conclude that this case must be remanded in order that market data may be introduced to show the competitive effects of Texaco's sales commission agreements with Goodrich and Firestone upon competing suppliers of tires, batteries and accessories at the manufacturing, wholesale and retail levels."

Having thus concluded that the legality of the sales commission agreements depends upon "the characteristics [2] and the competitive effects" of the agreements, the Commission closed its opinion by saying:

"However, the record in this case does not contain sufficient market data to enable the Commission to assess the competitive effects of the sales commission method of distributing TBA employed by these respondents. The case will be remanded to the hearing examiner for the taking of evidence indicating the competitive effects of the sales commission contracts at the manufacturing, wholesale and retail levels of TBA distribution."

More than a year after the remand of March 9, 1961,[3] the examiner conducted hearings from July 16 to July 19, 1962, at which the only proof introduced was in the form of exhibits received over the objection of the petitioners. A new initial decision was filed by the examiner September 24, 1962. In it he incorporated the findings of fact of his first initial decision and made additional findings of fact based on the record as supplemented after remand. The examiner noted that he was bound by the Commission's reversal of his dismissal of Goodrich, and by its finding that Texaco has sufficient economic power over its dealers to cause them to purchase substantial amounts of sponsored TBA, even without the use of coercive tactics. He concluded that

"* * * the only issue left for consideration of the hearing examiner under the terms of the Commission's opinion and order of remand, is the competitive effects of the sales commission plan used by Goodrich with The Texas Company, and whether Texaco's exercise of such economic power in favor of Goodrich and Firestone under their sales commission contracts have sufficient competitive effect to constitute an unfair method of competition or an unfair act or practice."

The examiner disposed of the "only issue left for [his] consideration" by concluding that

"The use of the sales commission plan of distribution of TBA by the respondents, The Texas Company and The B. F. Goodrich Company as herein found, has a tendency and capacity to restrict, restrain or lessen competition in the sale of TBA products and constitutes an unfair method of competition and an unfair act and practice in commerce within the intent and meaning of Section 5 of the Federal Trade Commission Act."

In obedience to the Commission's order on remand, the examiner abandoned his former position, held Goodrich as a respondent, and concluded:

"The use of the sales commission method of distribution by Goodrich was designed to take advantage of the economic control which Texaco had over its dealers, and by such use, Goodrich was able to obtain an unfair advantage over its competitors in selling to Texaco stations and in addition, aided and abetted Texaco in removing from the open market a substantial number of new and established Texaco dealers by causing them to purchase Goodrich TBA exclusively or in substantial quantities, and thereby excluding competi-

---

2. The "characteristics" of the agreements were of course fully known to the Commission, which had before it their complete text.

3. A part of this period was consumed in the petitioners' unsuccessful attempt to enjoin further hearings.

tors of Goodrich who might otherwise have been able to sell their TBA to a substantial number of such Texaco dealers."

Although he had the first time dismissed Goodrich, and had merely ordered Texaco to cease and desist from the coercive practices he had found from the testimony of five ex-dealers, this time the examiner entered a broad order as to both respondents. He ordered Texaco to cease and desist from entering into or continuing in effect any contract with Goodrich or any other rubber company or tire manufacturer, or any other supplier of tires, batteries or accessories, by the terms of which Texaco receives anything of value in connection with the sale of TBA to its dealers. The examiner ordered Goodrich to cease and desist from operating under its contract with Texaco and prohibited it from entering into a similar contract with any other marketing oil company.

The order of remand of March 9, 1961, was entered by a Commission composed of Chairman Kintner and Commissioners Secrest, Anderson and Kern. Accompanying it was the opinion to which we have referred, written by Chairman Kintner and concurred in by the other three members of the Commission. Shortly thereafter—on March 21, 1961— Earl W. Kintner was replaced as Chairman by Paul Rand Dixon, who had not been a member of the Commission theretofore. One of the acts of the new Chairman when he had been in office only a short time led to the phase of the proceeding which we shall now consider.

On February 18, 1963, before the Commission had acted on the examiner's new initial decision of September 24, 1962, Texaco filed a motion that Chairman Dixon withdraw from participation in the proceeding or that the Commission determine him to be disqualified. The basis of the motion was a speech made by Dixon before the National Congress of Petroleum Retailers, Inc., in Denver, Colorado, on July 25, 1961, while the case was pending before the examiner after remand and before any steps had

been taken by him. In the course of his address, according to a press release issued by the Commission itself, the then newly appointed Chairman of the Commission said:

"Your problems are many, and many of them are the problems of the Federal Trade Commission, too; for the Commission is concerned with promoting fair competition. More particularly, many of your problems are ours because they arise from practices prohibited by two of the most important statutes administered by the Commission—discriminatory pricing, prohibited by the Robinson-Patman Act, and other unfair acts, practices, and methods of competition, prohibited by the Federal Trade Commission Act.

\* \* \*

"We at the Commission are well aware of the practices which plague you and we have challenged their legality in many important cases.

"You know the practices—price fixing, price discrimination, and overriding commissions on TBA.

"You know the companies—Atlantic, Texas, Pure, Shell, Sun, Standard of Indiana, American, Goodyear, Goodrich, and Firestone.

\* \* \*

"Some of these cases are still pending before the Commission; some have been decided by the Commission and are in the courts on appeal. You may be sure that the Commission will continue and, to the extent that increased funds and efficiency permit, will increase its efforts to promote fair competition in your industry."

The Commission denied the motion that it determine Chairman Dixon to be disqualified, and he declined to withdraw from participation. Instead, he took part in the entry of the order of April 15, 1963, more than two years after the remand, which adopted the examiner's initial decision and order of September 25, 1962, which, as we have seen, was adverse to Texaco and Goodrich and which

is now under review. Before turning to the question whether the order of April 15, 1963, was supported by the record, we consider the propriety of Chairman Dixon's participation in that decision.

In Gilligan, Will & Co. v. Securities and Exchange Comm'n, 2 Cir., 267 F.2d 461 (1959), the Commission, three days after commencing proceedings, issued a press release stating in effect that Gilligan, Will & Co. and others had violated Section 5 of the Securities Act of 1933. Although the Second Circuit held that petitioners' failure to make timely objection had waived their right to assert the defect of prejudgment, the Court strongly disapproved of the Commission's behavior. It said, at pages 468–9:

" * * * [T]he Commission's reputation for objectivity and impartiality is opened to challenge by the adoption of a procedure from which a disinterested observer may conclude that it has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it. * * * "

In this case, a disinterested reader of Chairman Dixon's speech could hardly fail to conclude that he had in some measure decided in advance that Texaco had violated the Act.

■ We said in Amos Treat & Co. v. Securities and Exchange Comm'n, 113 U. S.App.D.C. 100, 107, 306 F.2d 260, 267 (1962):

" * * * [A]n administrative hearing of such important and vast potential consequences must be attended, not only with every element of fairness but with the very appearance of complete fairness. Only thus can the tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process."

The administrative hearing in the present case was certainly as important as that in the Amos Treat case, and has perhaps even greater potential consequences. We conclude that Chairman Dixon's participation in the hearing

amounted in the circumstances to a denial of due process which invalidated the order under review. If that were the only infirmity in the order, we should be constrained to remand the cases to the Commission for a *de novo* consideration, in which Chairman Dixon does not take part. His Denver speech, made before the matter was submitted to the Commission but while it was before the examiner, plainly reveals that he had already concluded that Texaco and Goodrich were violating the Act, and that he would protect the petroleum retailers from such abuses.

■ But that is not all. The Supreme Court has said that in reviewing the substantiality of the evidence we must consider all the evidence including "the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487–8, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Viewed in this way we are convinced that the order of April 15, 1963, is not supported by substantial evidence on the record as a whole. The order under review, as we have said, adopted the examiner's initial decision and order of September 24, 1962, after slight modification. In it, the Commission said:

"Respondents contend that the tables, surveys, and matters officially noticed by the examiner on remand were improperly admitted both because they are inappropriate objects for official notice and because respondents were afforded inadequate opportunity to rebut them.

"It is not necessary to pass upon the correctness of these contentions, since the Commission excludes from its present decision any reliance upon the challenged evidence. It finds that the other evidence of record amply supports the conclusions and the order of the hearing examiner. The legal principles relevant to this decision need not be reexamined here because they are set forth at length in the opinions of the Commission in Goodyear Tire & Rubber

Co., et al., Docket 6486, March 9, 1961, and Firestone Tire & Rubber Co., et al., Docket 6487, March 9, 1961. * * * " 4

Thus, in its consideration of the revised initial decision and order, the Commission expressly disclaimed any reliance upon the evidence introduced after remand, and held that the evidence or record before the remand "amply supports the conclusions and order of the hearing examiner." This was the same record which the Commission on March 9, 1961, had said "does not contain sufficient market data to enable the Commission to assess the competitive effects of the sales commission method of distributing TBA employed by these respondents."

But, in successfully resisting an action in the District Court by Texaco and Goodrich to enjoin the remand, the new Commission contended that it "needed additional evidence in order to decide the issues presented." It asserted that the opinion of March 9, 1961, ordering the remand showed that the Commission "is not seeking a retrial of matters already tried but rather envisions supplementary evidence on what it considered to be significant facts in any assessment of the competitive effects of the sales commission agreements * * *."

Despite these representations, the Commission on April 15, 1963, contrary to the former Commission's determination that the record did not justify such a finding, found the petitioners in violation of Section 5 of the Federal Trade Commission Act on the basis of that record. It adopted the examiner's revised order which prohibited Goodrich from entering into sales commission agreements with Texaco or any other marketing oil company, and prohibited Texaco from entering into such agreements with Goodrich or any other rubber company or tire manufacturer, or any other supplier of tires, batteries or accessories.

The new Commission placed itself in an anomalous position: first, it vigorously asserted (as the former Commission had held when it remanded the proceeding) that it could not find against the petitioners without additional evidence as to the competitive effects of the sales commission contracts; then, it decided that same issue against the petitioners without any consideration of the record made after remand, and without repudiating or even commenting upon its confessed inability to reach that issue previously.

Although the two Commissions reached diametrically opposite conclusions from the same record as to whether unfair competition had been shown, both based their action upon their conclusion that

"Texaco has sufficient economic power over its wholesale and retail petroleum distributors to cause them to purchase substantial amounts of sponsored TBA *even without the use of overt coercive tactics.* * * " 5 (Emphasis supplied.)

But neither Commission referred to any evidence in support of this finding,

4. It is perhaps not without significance that Commissioner Anderson, the only member of the Commission as constituted on April 15, 1963, who had participated in the remand of March 9, 1961, did not concur "for the reason that the command of the remand order of March 9, 1961, has not been met and complied with * * *."

5. Although the examiner concluded in his first initial decision that the record "as a whole" indicated coercion had been brought on "a substantial number of dealers" (five former dealers out of many thousands of former and active dealers),

the remanding Commission apparently did not regard such meagre proof as convincing, for it expressly discarded it as a basis of decision, and concluded as stated in the text above that Texaco had controlling economic power over its dealers without the use of coercive tactics.

The examiner's first initial decision had not so concluded, but the remanding Commission's conclusion as to Texaco's economic power was parroted by him in his initial decision after remand. He added thereto the following sentence selected from another portion of the remanding Commission's opinion: "Such

and neither made any finding of fact which would sustain a conclusion that Texaco had such economic power over its dealers, and we are unable to see substantial evidence on the record as a whole to sustain that conclusion. The Commission did not reject its examiner's statement that no inference can be drawn from the contracts between Texaco and its dealers that the former has sufficient economic power over the latter to force them to purchase only sponsored TBA. And it did not say (for there was no proof from which it could conclude) that Texaco's treatment of its dealers and their reaction indicated that Texaco had, or had attempted to exercise, the controlling economic power over its dealers that the Commission found. Indeed, the examiner found as a fact that Texaco's policy, announced to all its salesmen as long ago as June 1, 1948, is that it has neither the right nor the desire to dictate to the dealer or to influence him in any way as to the type of merchandise he should handle, or the source from which he should purchase it.[6] This finding was adopted by the Commission.

■ Consequently, we find no basis in the record for the Commission's conclusion that Texaco has controlling economic power over its dealers. The contracts with the dealers do not give rise to it, and it is the announced policy of Texaco to respect the independence of its dealers; as the evidence overwhelmingly shows, its practice has followed its policy. The mere fact that Texaco is a giant corporation and the dealers are in the main small businessmen cannot be said to demonstrate controlling economic power over the latter, particularly when, as here, the evidence is to the contrary. We hold, therefore, that the Commission erred in concluding that Texaco has sufficient economic power over its dealers, without the use of coercive tactics, to cause them to buy substantial quantities of Goodrich TBA. We have already noted that the Commission did not find coercive tactics had been used, and that the record as a whole demonstrates the contrary.

From its unwarranted assumption that Texaco had such economic power, the Commission proceeded to the conclusion that the question whether the exercise of that power in Goodrich's behalf amounts to an unfair method of competition depends on the "competitive effects" of the sales commission agreements. It said that Texaco's controlling economic power is a "key fact" in evaluating the competitive effects of the sales commission contracts. Thus, the Commission itself said that the supposed need to examine the "competitive effects" was due entirely to its conclusion that Texaco not only had, but exercised, controlling economic power over its dealers without using coercive tactics. This conclusion was indeed the keystone of the Commission's ultimate decision, without which it cannot stand. That being true, our holding that there

economic power exists independent of any particular method of distributing TBA which Texaco might use." This new conclusion was adopted by the Commission in its decision of April 15, 1963. Consequently, both Commissions concluded that Texaco had controlling economic power without the use of coercive tactics.

6. Finding of Fact No. 8 in the examiner's post-remand initial decision is as follows:

"As a result of an antitrust suit filed against Standard Oil Company of California, Walter Hochuli, General Sales Manager of The Texas Company, on June 1, 1948, issued a so-called policy letter to the territorial managers, which was subsequently disseminated down the chain of command to salesmen. This letter advised the personnel that they were to consider a Texaco dealer as an independent businessman; that he should be encouraged to expand his business by purchasing TBA; that the personnel have a right to recommend certain lines, but that Texas has neither the right nor the desire to dictate to the dealer or to influence him in any way as to the type of merchandise he should handle, or the source from which he should purchase it; that the Texaco dealer must be permitted to operate as an independent businessman and anyone who violates this policy would be subject to immediate dismissal."

is not a substantial evidentiary basis in the record for the Commission's assumption that Texaco had and exercised coercive economic power causes its conclusion based thereon to collapse.

■ The Commission's sweeping order not only condemned the Texaco-Goodrich contract but also held illegal any sales commission arrangement between an oil marketing company and a TBA supplier. This either attributes to all such oil companies inherent controlling economic power over their dealers, or implies there is basic illegality in such arrangements. Our view is that, in any case, there must be substantial evidence on the whole record of the supposed economic power of the oil marketing company before a prohibiting order can be based upon it. As to the implication that sales commission agreements between oil companies and TBA suppliers are basically illegal regardless of their terms, we disagree. There is no reason to condemn such contracts unless they result in unfair competition. An oil marketing company's recommendation to its dealers that they purchase a particular line of TBA, even though it receives a commission for doing so, is not incompatible with its primary business of selling petroleum products. The dealers, at least in the situation here involved, are quite free to accept or reject the recommendation, and to handle a different line if they think it would be more acceptable to their customers.

■ The Commission's broad order prohibited contracts for sponsorship of TBA sales to oil marketing company dealers only when the company receives compensation for the sponsorship. The vice found by the Commission in the arrangement seems therefore to be the payment of commissions. Yet the Commission adopted the findings of the examiner which described in detail the services performed by Texaco under its contract with Goodrich and also adopted his conclusion that

> "The consideration for the payment of a commission to Texas under the sales commission contract is based upon substantial services rendered by Texas in promoting the sale of Goodrich TBA to Texaco dealers and distributors."

We see nothing illegal or even unethical in the payment of commissions for such services, except in instances where an oil marketing company forces its dealers through coercive tactics or controlling economic power to buy the sponsored products. Neither of those influences was proved in this case, and it may not be presumed that either will exist in future similar situations.

■ After four years of preliminary investigation followed by eight years of litigation, including the remand for additional evidence said to have been necessary but never used, the Commission has not been able to show illegality in the Texaco-Goodrich contract of 1940. During that long period, the companies necessarily have devoted much time and money to their defense. Although the Commission must be allowed considerable leeway in developing a record, its efforts in this case—fruitless after a dozen years—have exceeded permissible limits and have had unreasonably harassing and oppressive effects upon the companies under attack. Because the Commission's drastic orders are not supported by the record as a whole and because of the undue protraction of the administrative process, we are of the opinion that this long drawn out proceeding should now be terminated. Accordingly, the order under review will be set aside, and the matter will be remanded to the Commission with instructions to dismiss the complaint.

It is so ordered.

WASHINGTON, Circuit Judge (concurring in part and dissenting in part):

I agree with the majority that Chairman Dixon's conduct disqualified him from participating in the Commission's order, and that the order must be set aside for that reason. I would not, however, dismiss the entire proceeding, ei-

764

ther on the merits or because of the Commission's delays. I would remand for further consideration of the case by the Commission, without the participation of Chairman Dixon, and on a basis which I will outline later on.

## I.

With reference to Chairman Dixon's conduct, I would add only this. Federal Trade Commissioners, like other adjudicators, are entitled to hold and express views on the laws they are charged with enforcing and applying. They "do not stand aloof on * * * chill and distant heights; and we shall not help the cause of truth by acting and speaking as if they do." [1] We do not equate impartiality with utter indifference. A judge does not deny litigants a fair hearing by sitting in a case "after he had expressed an opinion as to whether certain types of conduct were prohibited by law." [2] We do not expect a Trade Commissioner to be neutral on anti-monopoly policies.

A fair hearing is denied, however, if the administrative judge, prior to examining the evidence and findings, has indicated his belief that named individuals or firms are violating the statute, and the "guilt" or "innocence" of such parties depends on certain factual findings which are in dispute. Once an adjudicator has taken a position apparently inconsistent with an ability to judge the facts fairly, subsequent protestations of open-mindedness on his part cannot restore a presumption of impartiality. Whether justice was in fact done is not the issue; an administrative hearing "must be attended, not only with every element of fairness but with the very appearance of complete fairness." [3] We must presume that a fair hearing was denied [4] if a disinterested observer would have reason to believe that the Commissioner had "in some measure adjudged the facts * * of a particular case in advance of hearing it." [5]

Chairman Dixon's speech leaves a clear impression that his belief that petitioners had violated the Act was far stronger than the "reason to believe" which justifies the issuance of a complaint. Indeed, his speech suggests not only a substantial conviction that Texaco and Goodrich are violating the Act but an implied promise to support the petroleum retailers in their struggle against alleged abuses by their suppliers. An independent observer could fairly conclude that Chairman Dixon was in some measure pre-committed to a determination adverse to petitioners. We must therefore —at the least—vacate the Commission's order and remand to the Commission for a de novo consideration of the record and the arguments without the participation of Chairman Dixon.[6]

1. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 168 (1921).

2. Federal Trade Commission v. Cement Institute, 333 U.S. 683, at 703, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

3. Amos Treat & Co. v. Securities and Exchange Commission, 113 U.S.App.D.C. 100, 107, 306 F.2d 260, 267 (1962).

4. "[J]ustice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).

5. Gilligan, Will and Co. v. Securities and Exchange Commission, 267 F.2d 461, 469 (2d Cir. 1959). In that case the Securities and Exchange Commission, three days after commencing adjudicatory proceedings, had issued a press release, stating that the parties involved had violated the relevant Act. The Second Circuit, in dicta, strongly disapproved of the Commission's behavior, but held that petitioners had waived their right to object by failing to make a timely motion.

6. Federal Trade Commission v. Cement Institute, supra, is to be distinguished on the grounds that (a) the disqualification of the entire Commission, which was there sought, would have effectively precluded any enforcement of the Act against the respondent (the "necessity doctrine") and (b) the opinion does not indicate that the Commissioners had expressed a focussed bias against the respondent, rather a general "policy" bias against basing point systems.

## II. *The Absence of Reviewable Findings.*

The Commission's decision consisted of an assertion that the "other evidence of record [7] amply supports the conclusions and the order of the Hearing Examiner. The legal principles relevant to this decision need not be reexamined here because they are set forth at length in the opinions of the Commission in Goodyear Tire & Rubber Co. * * * and Firestone Tire & Rubber Co. * * "

Section 8(b) of the Administrative Procedure Act, 5 U.S.C. § 1007(b) (1958), provides in part that all decisions "shall * * * include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record * * *." Recently, the Supreme Court set aside an order of the Interstate Commerce Commission, partly on the ground that—

"There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such adjudicatory practice." [8]

The mere citation of earlier opinions does not provide a sufficient basis to understand and evaluate the Commission's decision on the facts of this case. There are a variety of facts and findings relied on by the Commission in the *Goodyear* and *Firestone* cases which cannot be readily assumed here. For example, on the issue of coercion, in *Goodyear* the Commission found that "Atlantic dealers have been orally advised by sales officials of the oil company that their continued status as Atlantic dealers and lessees will be in jeopardy if they do not purchase sufficient quantities of sponsored TBA." [9] In *Firestone* the Commission pointed to internal memoranda of the Shell Oil Company to support the conclusion of coercion. In both cases the Commission purported to make an examination of the competitive effects of the sales commission plan, saying, "Determination of illegality in this context requires an evaluation of competitive effects resulting from respondents' use of the sales commission method of distributing TBA," [10] and, in pursuing an alternative theory of a tie-in arrangement, purported to make findings on Atlantic's and Shell's economic power in the "tying" commodity.

Also to be noted is the fact that on the same day that the Commission decided *Goodyear* and *Firestone*—March 9, 1961 —it considered this case, and did not affirm the findings of actual coercion but remanded to the Examiner for the taking of further evidence on "competitive effects":

"[T]he record in this case does not contain sufficient *market data* to enable the Commission to assess the competitive effects of the sales commission method of distributing TBA employed by these respondents." [11] (Emphasis supplied.)

---

7. That is, exclusive of certain evidence adduced in the remand proceeding, which petitioners claimed was improperly admitted, and which the Commission in fact stated that it would not consider.

8. Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

9. 58 F.T.C. 309, 342 (1961).

10. Firestone, 58 F.T.C. 371, 408 (1961); Goodyear, *supra*, at 365. *E.g.*, Shell accounted for about 5% of the total gasoline sold at retail in the United States in 1955, 58 F.T.C. at 407; Firestone accounted for 15.3% and Goodyear 21.4% of total replacement tire sales at consumer level in 1954. 58 F.T.C. at 409.

11. In Goodyear and Firestone the Commission considered such "competitive effects" as division of markets between manufacturers, foreclosure of battery and accessory manufacturers, foreclosure of smaller tire manufacturers, restraint on expansion of smaller tire manufacturers' distribution systems, foreclosure of wholesalers, presumption in favor of wholesalers selling sponsored products, and the impact on wholesalers who also sell at retail.

On April 15, 1963, the Commission, reviewing the Hearing Examiner's remand decision, affirmed his conclusions of a statutory violation, even though it excluded from consideration any new evidence adduced on the remand, and cited the *Goodyear* and *Firestone* cases, even though the Commission had previously declined to find a violation on this record, when it remanded simultaneously with its formulation and application of legal theories in the companion cases. The one Commissioner who had participated in the earlier decisions and was on the Commission on April 15, 1963, dissented from the decision rendered on that date.

These considerations indicate, not that the evidence, as a whole, fails to support a finding of a Section 5 violation under a proper interpretation of that section, but that the Commission failed to perform its function of articulating the facts and spelling out its theories. The Commission's decision falls short of the standards required for judicial review, for we are unable to discern with a fair degree of certainty the facts or the theories relied on below.[12] Under the circumstances, we should express no opinion on the merits.

In my view, we should hold simply that a court must know why a Commission acted in order to fulfill the function of judicial review (Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954)), and that businessmen and other parties subject to administrative regulation are entitled to an explanation of their duties and obligations. Thus, even in the absence of the disqualification issue, we would—in my view—find it necessary to remand for a proper opinion. See Radio Station KFH Co. v. Federal Communications Commission, 101 U.S.App.D.C. 164, 247 F.2d 570 (1957).

For the reasons given, I would set aside the Commission's order but would pass neither on the merits nor on other issues argued by the parties. The Commission could then be required to produce a new opinion within a reasonable time, such as sixty days, meeting the standard for judicial review.

## III.

Though, as I have indicated, I do not think we should pass on the merits, the majority has done so. Under the circumstances, I am constrained to say that in my view the majority's conclusion that the record does not contain sufficient evidence to support a finding of a Section 5 violation is very doubtful. The crucial failing, in the court's view, is the lack of evidence to establish that Texaco has sufficient economic power over its dealers to compel them to handle Goodrich tires exclusively. I submit that under the antitrust laws, Texaco's relationship to its dealers must probably be deemed inherently coercive. See, e. g., Simpson v. Union Oil Company of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); Standard Oil Company of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (opinion for the Court per Frankfurter, J.), 323 (concurring opinion of Jackson, J.) (1949); Federal Trade Commission v. Motion Picture Advertising Service Co., 344 U.S. 392, at 402, 73 S.Ct. 361, 97 L.Ed. 426 (1953) (Frankfurter, J., in dissent, explaining his opinion in Standard Stations, supra); Osborn v. Sinclair Refining Co., 286 F.2d 832 (4th Cir. 1961); United States v. Sun Oil Co., 176 F.Supp. 715, 719–20 (E.D.Pa.1959); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D.Md.1956); United States v. General Motors Corp., 121 F.2d 376, 398 (7th Cir.), cert. denied, 314 U.S. 618, 62 S.Ct. 105, 86 L. Ed. 497 (1941). See, also, the recent opinion of the Seventh Circuit in Goodyear Tire & Rubber Co. v. Federal Trade Commission, 331 F.2d 394 (1964). See, generally, S.Rep.No.2073, 84th Cong., 2d Sess. (1956); H.R.Rep.No.

12. See, *e.g.*, Interstate Commerce Commission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); Connecticut Light & Power Co. v. Federal Power Commission, 324 U.S. 515, 532, 65 S.Ct. 749, 89 L.Ed. 1150 (1945).

2850, 84th Cong., 2d Sess. (1956), U.S. Code Cong. and Adm.News 1956, p. 4596, relating to the Automobile Dealers' Franchise Act, 70 STAT. 1125, 15 U.S.C. § 1221 et seq.

Evidence which might tend to show coercive power in this case includes (a) one year leases and sales agreements, terminable at the year's end upon 10 days' notice; (b) substantial contractual control by Texaco over the use, maintenance and appearance of stations (the obligations imposed by Texaco, in addition to being evidence of Texaco's bargaining power, are means by which Texaco could prematurely terminate the lease through enforcement of one of those obligations, under cancellation provisions); (c) high personal investments by the lessees in their stations; (d) close dealer supervision by Texaco salesmen; (e) Goodrich's manifest understanding that Texaco controls its dealers (e. g., Goodrich's books refer to the dealers as "oil company controlled dealers"); (f) testimony of competing TBA suppliers that Texaco dealers felt they risked reprisal if they did not carry sponsored TBA, and (g) testimony of former Texaco dealers of the existence of a pattern of coercive conduct throughout their tenure. Other evidence in the record that Texaco imposed a course of purchasing behavior on the dealers may be summarized by quoting from page 51 of Respondent's brief:

"* * * the services performed by Texaco pursuant to its contracts include: Stressing the importance of TBA to *prospective* dealers and recommending BFG and Firestone; giving advance notice of dealer selection to BFG or Firestone and introducing new dealers to their salesmen; assisting new dealers with adequate TBA inventories; encouraging its salesmen to write sponsored TBA orders without awaiting formal dealer request; calling on dealers with BFG or Firestone salesmen ('double teaming'); conducting frequent dealer meetings and training courses, with active BFG and Firestone participation; arranging for and participating in BFG and Firestone advertising and promotions; and permitting sponsored TBA purchases on its credit cards. Texaco training schools are conducted at company-owned service stations where only BFG or Firestone TBA is used. This can only solidify the dealer's 'choice' of sponsored TBA."

Thus, I suggest that it may well be the record as a whole would support findings of both the existence and the utilization of coercive economic power by Texaco over its dealers. Were we reviewing the Hearing Examiner's findings, and formulating the appropriate legal theory in the first instance, I suggest that we might also properly conclude that there was sufficient evidence of anticompetitive effect to warrant finding a violation under a tie-in theory.[13] But

13. On the appropriate test of anti-competitive effect necessary to sustain a finding that a tie-in violates Section 1 of the Sherman Act (which generally puts a more stringent burden on the Government than does Section 5 of the FTC Act), see *e.g.*, Northern Pacific Railway Co. v. United States, 356 U.S. 1 at 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The percentage of the gasoline station market for TBA controlled by Texaco, on any reading of the record, certainly affects a "not insubstantial" amount of interstate commerce. See International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), and Brown Shoe Co. v. United States, 370 U.S. 294, 330, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

On utilization of a tie-in theory under circumstances similar to those of the instant case, see Osborn v. Sinclair Refining Co., *supra*, 286 F.2d 832 (4th Cir. 1961). The fact that Texaco's power and practices resulted in something less than exclusive dealer use of sponsored TBA would not seem to require a different result. *Id.* at 838–39. See, also, the decision of the Seventh Circuit, in an appeal from a parallel decision of the Federal Trade Commission relied on below, Goodyear Tire & Rubber Co. v. Federal Trade Commission, 331 F.2d 394 (1964).

in the first instance it is the Commission, not this court, which must indicate what facts and what legal theories constrained it to find a violation. We could of course select those legal doctrines appearing in the cases cited in the Commission's opinion—*Goodyear* and *Firestone*—and those facts in the record before the Hearing Examiner, which would sustain the Commission's conclusions, and then affirm. But aside from the fact that such an approach would be less than faithful to the appropriate institutional relationship between this court and the Commission, it would not be possible in this case because of Chairman Dixon's disqualifying conduct.

The delays in this case are serious.[14] But I would not terminate the proceedings because of them. The public interest in effective competition should not lightly be subordinated to Texaco's interest in speedy adjudication.

14. See, generally, *Note, Judicial Acceleration of the Administrative Process: The Right to Relief from Unduly Protracted Proceedings*, 72 YALE L.J. 574 (1963).