**Adrian ANTONIU, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

Nos. 85–5384, 88–1095.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 17, 1988.

Decided June 19, 1989.

Rehearing and Rehearing En Banc Denied July 31, 1989.

---

David Stratman, Albuquerque, N.M., for petitioner.

Martha H. McNeely, S.E.C., Washington, D.C., for respondent.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

LAY, Chief Judge.

Adrian Antoniu (Antoniu) worked from August 1972 until May 1975 in the corporate finance department of Morgan Stanley & Co., Inc. (Morgan Stanley), a broker-dealer registered with the Securities and Exchange Commission (SEC or Commission). Antoniu entered into an insider trading conspiracy with James N. Newman (Newman), a securities trader. Antoniu would obtain the non-public information about imminent takeover bids by Morgan Stanley's clients.

Newman would then buy large blocks of stock of the targeted companies and later sell the stock at a profit. Antoniu shared in the profits.

Morgan Stanley asked Antoniu to resign and he took a position at Kuhn Loeb & Co. (Kuhn Loeb) (later Lehman Brothers Kuhn Loeb, Inc.) in the newly established mergers and acquisitions department. Antoniu continued to receive market-sensitive non-public information from Morgan Stanley employee E. Jacques Courtois. While at Kuhn Loeb, Antoniu repeated the pattern: he misappropriated the information and passed it to Newman, who bought and sold stocks of target companies. The conspirators split the profits. Kuhn Loeb fired Antoniu in 1978 when he was investigated for insider trading violations. Antoniu then moved to Italy.

On November 13, 1980, Antoniu pled guilty to two counts of misappropriating information in securities markets in violation of 15 U.S.C. §§ 78j(b) and 78ff, and Rule 10b–5, 17 C.F.R. 240.10b–5 and 18 U.S.C. § 2, as part of a plea bargain.[1] He was sentenced to three months' imprisonment, thirty-six months' suspended sentence and a $5000 fine, on August 11, 1982. On March 31, 1983, the sentence was reduced to thirty-nine months' unsupervised probation and a $5000 fine.

In 1984, Antoniu moved to Minnesota to take a job with M.H. Novick & Co. Due to Antoniu's criminal conviction, Antoniu and Novick sought approval for the employment from the National Association of Securities Dealers (NASD). After an evidentiary hearing, NASD approved the employment on June 3, 1985. Antoniu went to work for Novick later that summer.

On September 3, 1985, the SEC vetoed NASD's approval of that particular employment. (This set of proceedings is hereinafter referred to as *Antoniu I*). One of

---

1. Antoniu was only charged with two counts. The two counts involved criminal misuse of information about two impending takeovers: that of Northrup King & Co. by Sandoz Seed Co., and that of Deseret Pharmaceutical Co., Inc. by Warner Lambert, Inc. The SEC determined that these two transactions were representative of at least fourteen acquisitions in which Antoniu had misappropriated non-public information. As a result of Antoniu's agreement to the plea bargain, the U.S. Attorney's Office did not further prosecute Antoniu. *See* Brief for Appellee at 5 nn. 3, 4.

the participating commissioners was Charles C. Cox. On September 19, 1985, the SEC started a second set of proceedings (hereinafter referred to as *Antoniu II*). Commissioner Cox also took part in the SEC's decision to institute *Antoniu II.* The purpose of this second set of proceedings was to determine whether Antoniu should be subjected to sanctions due to his criminal conviction. In other words, the Commission was to determine whether it was in the public interest to exclude Antoniu from *any* employment in the securities business.[2]

While *Antoniu II* was pending, on October 18, 1985, Commissioner Cox gave a speech in Denver entitled "Making the Punishment Fit the Crime—A Look at SEC Enforcement Remedies." The speech outlined two recent cases before the SEC in which the Commission had imposed sanctions on firms or persons. Commissioner Cox said that each of the sanctioned entities was an "indifferent violator" and further expounded:

> Mr. Antoniu, on the other hand, can be appropriately termed a violator, for he pled guilty to criminal violations of the federal securities laws. In his positions at Morgan Stanley and Kuehn [sic], Loeb and Company, he provided inside information on several occasions to accomplices who traded while in possession of that information. Although he was prosecuted for this conduct, Mr. Antoniu recently applied to become associated with a broker-dealer. Apparently, Mr. Antoniu believed that, since his rehabilitation was complete, there was no further reason to prevent his future dealings in the securities industry. In that case, the Commission responded by denying Mr. Antoniu's request for association.
>
> One issue that frequently arises with respect to individuals whom I call "indifferent violators" is the length of time

that a Commission remedy should remain in effect. This may come up when originally structuring the settlement of an injunction or an administrative proceeding, or in later applications for relief from an injunction or Commission order. * * * *In the case of Mr. Antoniu, his bar from association with a broker-dealer was made permanent.*

(Emphasis added).

Cox's words describing Antoniu's bar as permanent can only be interpreted as a prejudgment of the issue. We emphasize that the speech was made while the *Antoniu II* proceedings were pending.[3] The text of the speech was also printed and distributed by the SEC. Following Cox's public denouncement of him, Antoniu made multiple requests in the administrative proceedings for permission to develop the record on the issue of bias. His requests were denied. Antoniu also made a motion on April 6, 1986, to disqualify the whole Commission. The motion was denied and specifically, Commissioner Cox refused to recuse himself. He continued to participate in the *Antoniu II* proceedings, including the SEC's rejection of Antoniu's proposed settlement. Commissioner Cox did finally recuse himself, on December 3, 1987, the day the *Antoniu II* opinion of the Commission was handed down.

In the final *Antoniu II* opinion, the SEC found:

> Antoniu's misconduct could hardly be more serious. As the law judge observed, it was not the product of impulse or attributable to a temporary lapse in judgment or ethics. Rather, it arose from a carefully conceived scheme that Antoniu devised, using accomplices that he recruited. He engineered a protracted and complex operation to betray his employers' trust by misappropriating

---

**2.** Since *Antoniu I* concerned a bar to one particular employment and *Antoniu II* concerned a permanent bar of any securities-related employment, the government asserts *Antoniu II* encompasses *Antoniu I.*

**3.** The *Antoniu I* order was dated September 3, 1985. *Antoniu II* proceedings were instituted

September 19, 1985, and the speech was given on October 18, 1985. The *Antoniu II* initial decision, permanently barring Antoniu from all securities-related employment, was filed on September 23, 1986. The final opinion of the Commission was filed on December 3, 1987.

confidential information for personal gain.

\* \* \* \*

As we have so often emphasized, the securities industry is heavily dependent upon the integrity of its participants. We must protect the public from persons like Antoniu whose demonstrated conduct falls so far below acceptable standards of honesty and trust. We recognize the serious effect of the sanction we are imposing. Yet we are convinced that a lesser remedy will not suffice. Under all the circumstances, particularly the egregious and protracted nature of Antoniu's misconduct, we conclude that the public interest requires that Antoniu be barred from association with any broker or dealer.

In the Matter of Adrian Antoniu, S.E.C. Rel. No. 25169, Admin.Proc. File No. 3–6566 at 7–8 (Dec. 3, 1987) (hereinafter *Antoniu II* opinion).

Antoniu appeals the SEC's orders, raising a number of arguments. After careful consideration, we find that only one of them merits our attention. Due in part to Commissioner Cox's remarks about Antoniu made in the Denver speech, Antoniu claims that the proceedings were biased or at least that they were impermissibly tainted with the appearance of impropriety. Antoniu raises several other points [4] besides Cox's involvement in support of his claim of the SEC's prejudiced treatment of his case. As to these, we affirm the Commission's finding [5] that they lack substance. We do however, address Commissioner Cox's behavior in regard to this case.

We begin with the fundamental premise that principles of due process apply to administrative adjudications. *See Amos Treat & Co. v. SEC,* 306 F.2d 260, 264 (D.C.Cir.1962). The Supreme Court has described the requirements of due process: "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). The Court has demanded not only a fair proceeding, but also that " 'justice must satisfy the appearance of justice.' " *Id., citing Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). The relevant inquiry is thus whether Commissioner Cox's post-speech participation in the *Antoniu II* proceedings comported with the appearance of justice.

A number of other courts have entertained similar questions. In *Staton v. Mayes,* 552 F.2d 908 (10th Cir.) (as amended), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977), a school superintendent was dismissed by a majority vote of the school board. The members comprising the majority had made statements about the superintendent, both in public and in private, prior to any sort of hearing on the matter. The Tenth Circuit reviewed the trial court's approval of the school board's actions. The court said:

The firm public statements before the hearing by defendant Mayes for the removal of Dr. Staton, and the discussions by defendants Moore and Wade as admitted, reveal a tribunal not meeting the demands of due process for a hearing with fairness and the appearance of fairness. These were not mere statements on a policy issue related to the dispute, leaving the decision maker capable of judging a particular controversy fairly on the basis of its own circumstances. Nor was this simply a case of the instigation of charges and a statement of them during an investigatory phase by the body that will later decide the merits of the charges.

Instead this case involves statements on the merits by those who must make factual determinations on contested fact issues of alleged incompetence and will-

---

[4.] Antoniu argued "that he was singled out for prosecution because he is foreign-born, that he was denied the opportunity to prove his allegations concerning [SEC's] motivation and bias, and that his cross-examination of certain staff witnesses was improperly curtailed when they invoked grand jury secrecy rules." *Antoniu II* opinion at 5.

[5.] *Antoniu II* opinion at 5–6.

ful neglect of duty, where the fact finding is critical.

*Id.* at 914 (citations omitted). The court concluded:

> We do not say that such statements in an election campaign or between members were unlawful or improper. However, a due process principle is bent too far when such persons are then called on to sit as fact finders and to make a decision affecting the property interests and liberty interests of one's reputation and standing in his profession.

*Id.* at 915. The court accordingly vacated the trial court's judgment and invalidated the superintendent's firing. The court directed that if it wished to do so, the board could make new findings on the matter.

The District of Columbia Circuit has produced two cases which provide us with further guidance.

In *Texaco, Inc. v. FTC,* 336 F.2d 754 (D.C.Cir.1964), *vacated on other grounds,* 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965) (per curiam), the FTC had charged Texaco with unfair methods of competition in interstate commerce. After a lengthy set of adjudicative proceedings, the examiner found that Texaco had violated the Federal Trade Commission Act. While the case was pending before the examiner after remand[6] Chairman Dixon made a speech castigating Texaco as one of a number of companies engaging in price fixing and price discrimination. *See id.* at 759. Texaco's motion to disqualify Dixon was denied, and Dixon refused to recuse himself. The court admonished: "[A]n administrative hearing of such importance and vast potential consequences must be attended, not only with every element of fairness but with the very appearance of complete fairness. Only thus can the tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process." 336 F.2d at 760 (quoting *Amos*

*Treat & Co. v. SEC,* 306 F.2d at 267). The court found that Chairman Dixon's speech revealed that he had prejudged the matter. Dixon's continued participation in the proceedings violated due process. The court therefore invalidated the FTC's order.[7]

The District of Columbia Circuit again confronted the issue of Commissioner Dixon's behavior in *Cinderella Career and Finishing Schools, Inc. v. FTC,* 425 F.2d 583 (D.C.Cir.1970). There, the court addressed a factual scenario very similar to the one at bar. Federal Trade Commission Chairman Dixon had given a speech in which (without naming the targeted business) he condemned certain advertising practices as deceptive. Dixon's speech was given while the business' appeal from the examiner's decision was still pending before the Commission (including Dixon). The court found that Chairman Dixon should have disqualified himself, saying:

> The test for disquaification [sic] has been succinctly stated as being whether "a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 469 (2d Cir.), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

*Cinderella,* 425 F.2d at 591. The court then remanded the case with instructions "that the Commissioners consider the record and evidence in reviewing the initial decision, without the participation of Commissioner Dixon." *Id.* at 592.

We turn again to the case before us. Appellant raises a number of challenges to the *Antoniu I* proceedings. After careful review, we find no fundamental error of law in the action taken by the Commission in *Antoniu I.* The specific sanction imposed by *Antoniu I* was well within the discretion of the Commission. As to the *Antoniu I* proceedings, we affirm.

---

6. The recital of the complex procedural history of the case is omitted here. *See* 336 F.2d at 756–59.

7. Because the proceedings at issue there had been extremely protracted, the court went on to the merits. The court, however, advised: "If

[Dixon's participation] were the only infirmity in the order, we should be constrained to remand the cases to the Commission for a *de novo* consideration in which Chairman Dixon does not take part." 306 F.2d at 760.

It has been urged here that an affirmance of the *Antoniu II* order would moot the *Antoniu I* appeal. Because we find that *Antoniu II* must be vacated, we do not address the mootness issue.

After reviewing the statements made by Commissioner Cox, we can come to no conclusion other than that Cox had "in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 469 (2d Cir.), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). Even though Cox recused himself prior to the filing of the SEC's final decision, there is no way of knowing how Cox's participation affected the Commissioner's deliberations. Accordingly, we nullify all Commission proceedings (including the Commission's rejection of Antoniu's proposed settlement) in which Commissioner Cox participated occurring after Commissioner Cox's speech was given and remand the case to the Commission with directions to make a de novo review of the evidence, without any participation by Commissioner Cox. It is so ordered.