**SAFEWAY STORES, INCORPORATED,** Continental Baking Co., Buchan Baking Co., and George S. Buchan, Langendorf United Bakeries, Inc., Hansen Baking Company, Inc., and Richard Hoyt, Petitioners,

v.

**FEDERAL TRADE COMMISSION,** Respondent.

No. 19325.

United States Court of Appeals Ninth Circuit.

Sept. 14, 1966.

Rehearing Denied Oct. 25, 1966.

Herbert S. Little, Robert L. Palmer, Little, Gandy, Stephan, Palmer & Slemmons, Seattle, Wash., for petitioners Langendorf United Bakeries, Inc., Hansen Baking Co. and Richard Hoyt.

Robert W. Graham, George Constable, Bogle, Gates, Dobrin, Wakefield & Long,

Seattle, Wash., for petitioner Safeway Stores, Inc.

John H. Schafer, James V. Siena, Covington & Burling, Washington, D. C., Roy M. Anderson, Gordon A. Thomas, Rye, N. Y., for petitioner Continental Baking Co.

James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Charles C. Moore, Jr., Daniel H. Hanscom, Attys., F. T. C., Washington, D. C., for respondent.

Before MERRILL, BROWNING and ELY, Circuit Judges.

ELY, Circuit Judge:

Petitioners seek review of a cease and desist order issued by the Federal Trade Commission (FTC). The order relates to unlawful price-fixing acts and practices found to have been committed by the petitioners and others in the sale of bread. The FTC made and entered the challenged order under the authority of section 5(b) of the Federal Trade Commission Act, 15 U.S.C. § 45(b). Our power of judicial review is conferred by section 5(c) of the Act.

The petitioners are Continental Baking Company, Langendorf United Bakeries, Inc., Hansen Baking Co., Inc., Safeway Stores, Incorporated, and Richard Hoyt, an officer of Hansen. A number of others were involved in the proceeding, and while the order was directed against them also, they have not sought review.[1] They were held, with petitioners here, to have engaged in a conspiracy wrongfully to fix and regulate the price of bread in the general vicinity of Seattle, Washington.

Three of the petitioning baking companies, together with nearly all others who were charged in the Commission proceeding, were members of a voluntary organization called Bakers of Washington, Inc. This corporation, of which the petitioner Hoyt was vice-president, was also named as a respondent. It was initially incorporated in 1936 in the State of Washington under the name of Bakers of Western Washington, Inc. In August, 1937, the corporate name was changed to its present name. Bakers' members are classified by division according to geographical location. In September, 1961, there were fifty-nine members. More than half of these had places of business in Seattle, but divisions of the association were also located in other Washington cities, Aberdeen, Yakima, Bellingham, and Tacoma. All dues were paid to Bakers in Seattle. Both wholesale and retail bakeries were included in the membership, but within the trade areas served by the association, the great majority was engaged in wholesale distribution.

The Commission contends that much of the wrongful activity was committed through the conduct of Bakers and of two individuals who were its successive secretaries during the period in question. The purposes for which Bakers was formed, as specified by its corporate articles, included the collection and dissemination among its members of all lawful information for the benefit of the business of its members. Petitioners contend that the primary purposes of the association, though not specified in the articles, pertained to its negotiation of labor contracts as a collective bargaining agent for its member companies and its dealing with union labor grievances and with problems concerned with legislative and governmental regulations.

We must first examine petitioners' vigorous challenge of the Commission's power to exercise jurisdiction. It is claimed that the alleged acts and practices, even if wrongfully committed, were not committed "in commerce" within the meaning of section 5 of the Act. Petitioners assert that the challenged activities were wholly intrastate and are thus not within the intendment of the statute. The FTC insists that its jurisdiction is properly supported by three grounds, (1) sales of bread by certain of the petitioners to Alaskan customers, f. o. b. dockside

1. Petitioners Buchan Baking Co. and George S. Buchan, named in the heading, filed petitions but have offered no briefs in support of their position.

at Seattle, were sales in interstate commerce, (2) bread produced and sold by integrated, multistate corporations Continental, Langendorf, and Safeway is necessarily in interstate commerce, even if all sales were made in only one state, and (3) an unlawful conspiracy between petitioners, Bakers of Washington, Inc., and others, fixing the price of bread in the State of Washington, is an unfair method of competition in interstate commerce regardless of whether or not petitioners' bread sales in the State of Washington are considered to have been made in interstate commerce. We believe that the first ground sufficiently supports the Commission's jurisdiction and that it is unnecessary to examine the other two.

■ Four of the petitioners, Buchan, Continental, Hansen, and Langendorf, regularly sold bread to customers in Alaska, f. o. b. dockside at Seattle.[2] The Alaskan sales by each of these four amounted to less than one percent of its total sales. The prices to Alaskan customers were "regular wholesale prices," determined on the same basis as the prices for sales within Washington State. Therefore, price-fixing in the State of Washington necessarily affected the sales to Alaskan customers. The sales to the Alaskan customers were sales in interstate commerce. See Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 290, 42 S.Ct. 106, 66 L.Ed. 239 (1921); Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 241, 20 S.Ct. 96, 44 L.Ed. 136 (1899); California Rice Ind. v. FTC, 102 F.2d 716, 718 (9th Cir. 1939). This is sufficient to fix jurisdiction in the FTC. *E. g.,* Standard Container Mfr's Ass'n v. FTC, 119 F.2d 262, 265 (5th Cir. 1941). Petitioners contend, however, that we should ignore the Alaskan sales as a valid basis of jurisdiction by application of the doctrine of *de minimis non curat lex* and because the sales were unrelated to the alleged conspiratorial acts. We have recently held that only $3,086.31 in interstate purchases was sufficient to sustain the jurisdiction of the NLRB over a local cemetery association. NLRB v. Inglewood Park Cemetery Ass'n, 355 F.2d 448 (9th Cir. 1966). In that case, we quoted the Seventh Circuit's response to an argument of *de minimis*, "The time has not yet arrived when $2,000 is but a trifle." NLRB v. Aurora City Lines, Inc., 299 F.2d 229, 231 (7th Cir. 1962). Here the amounts involved are substantially greater than the amounts involved in the cited cases. The provisions of the respective statutes granting jurisdiction to the NLRB and the FTC are not identical. The labor statute probably is intended to be more extensive, but the question as to what is *"de minimis"* should not call for different answers. Assuming that the amounts of the Alaskan sales were *"de minimis,"* it would not necessarily follow that the FTC was here without jurisdiction. In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225 n. 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129 (1940), it was written, "the amount of interstate or foreign trade involved is not material (Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608), since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected." See also, United States v. McKesson & Robbins, Inc., 351 U.S. 305, 310, 76 S.Ct. 937, 940, 100 L.Ed. 1209 (1956) (Footnote omitted.), wherein the Court stated,

"It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the

---

**2.** In addition to such Alaskan sales other regular out-of-state shipments were made by Safeway and Snyder's Bakery, Inc. Safeway shipped bread from its Seattle plant to an adjoining state, and Snyder, a wholesale baker in Yakima, sold bread to retailers in the State of Oregon. On April 1, 1959, Trennery's Bakery Co. in

Yakima was acquired by Holsum Baking Company. Thereafter all bread sold by Trennery's in Yakima was imported from Lewistown, Idaho. Petitioners conceded in proceedings before the Commission that this bread sold in Yakima was "in commerce."

participants possess market control; *whether the amount of interstate commerce affected is large or small;* or whether the effect of the agreement is to raise or to decrease prices." (Emphasis added.)

See also, Sun Oil Co. v. FTC, 350 F.2d 624, 631–632 (7th Cir. 1965), cert. denied, 382 U.S. 982, 86 S.Ct. 559, 15 L.Ed. 2d 473 (1966).

The Alaskan sales were not wholly unrelated to the activities which the FTC seeks to prevent. The prices received for these sales, sales which were clearly made "in commerce," were determined in the same manner as sales made in the State of Washington. While it may be that the petitioners intended that their activities affect only those sales made within the State of Washington, the effect was otherwise.

■ Langendorf and Hansen contend that since they are engaged in the sale of bakery products at wholesale prices only, they could not have conspired to fix and maintain retail prices. The argument is specious. Continental, Langendorf, Hansen, and Buchan all stamp the retail price on the bread wrapper. The wholesale price paid by the retailer is the stamped retail price less twenty percent. This was established by testimony of representatives of the wholesale bakers. Any price-fixing activity with regard to the wholesale price would necessarily have a direct and immediate effect on retail prices.

■ All of the petitioners contend that the Commission's order is not supported by substantial evidence. We do not agree. Our attention is directed at certain significant and relevant facts.

Representatives of Continental, Langendorf, Hansen, and Buchan regularly attended the meetings of Bakers of Washington, Inc., at the Washington

Athletic Club. Meetings were held not less than twenty-six times annually. During the summer of 1958 meetings were held at which prices were discussed.[3]

On August 11, 1958, Continental, Langendorf, Hansen, and Buchan all put into effect identical increases of two cents per one and one-half pound loaf of white bread, from thirty-one cents to thirty-three cents. The bakery supervisor of Albertson's Stores, Inc., was informed by the secretary of Bakers of a price increase. Petitioners contend that prices were only casually discussed at the Bakers' meeting in connection with negotiation of labor contracts, but the record reveals that price discussions took place, not only prior, but also subsequent to labor negotiations.

On September 19, 1960, Hansen and Langendorf raised prices of the standard one and one-half pound loaf of white bread from thirty-three cents to thirty-four cents. Buchan and Continental made a similar increase three days later.

One example of a price rise after price discussions at the Bellingham division of Bakers took place in 1958. Robert Hall, of Hall's Bakery in Bellingham, which had been known as a "cut-rate" bakery, testified that he had been asked by "the representatives of Bakers of Washington, Inc." to join and follow in line with other bakeries in the prices set.

One Schafer, owner of a baking company, testified that a meeting of the Yakima division of Bakers was called subsequent to a price-cutting incident in that city. The meeting was attended by representatives of both wholesale and retail bakers. Schafer's testimony indicates that much of the discussion at the meeting was directed at the expressed need to coordinate prices among the retailers and eliminate "thrift-store" com-

---

3. Albert Pettersen, a former bakery supervisor for Albertson's Stores, Inc., owner of a grocery chain, a member of Bakers and a respondent below, testified,
"Well we discussed the labor, we discussed our price of our material—flour, shortening, sugar. And labor had jumped so high that *they* decided that we should have a raise in our bread. From there we just took it and they said, 'What do you think about certain prices?' and they kicked it around and, so that is as far as it went as long as I sat there." (Emphasis added.)

petition. Lalime, who became the secretary of Bakers in November, 1957, was quite active in maintaining prices. The bakery products supervisor of a grocery chain testified that after having lowered his company's price on raisin bread to nineteen cents per loaf, he received a telephone call from Lalime. Lalime informed him that a wholesale baker had complained about the nineteen-cent price and Lalime told the supervisor that he should charge the regular price. On another occasion, this superintendent himself made use of Bakers to combat price-cutting. He called up Lalime and complained of the low price of bread in Bellingham. Lalime told him not to cut his prices, "You just wait and let me take care of this." The supervisor testified,

> "Well, Mr. Lalime represents all the bakers here in the State of Washington and he is supposed to kind of keep us all in line, to try to help us all out. That is his job, to keep the people that belong to the association and to keep the prices where they belong."

Robert Hall testified that he had been solicited to join Bakers three times. He was told by Lalime that the purposes of the association were "to make better labor relations, *to maintain prices* and generally better baking conditions." (Emphasis added.)

■ The foregoing points to only some of the testimony from which it might be reasonably inferred that price-fixing activities occurred. "[T]he function of this Court is merely to make a comprehensive review of the record before the Commission and to determine if the findings are supported by substantial evidence on *such record considered as a whole.*" Goodman v. FTC, 244 F.2d 584, 589–590 (9th Cir. 1957) (Emphasis in original.) (Footnote omitted.) See also, Sun Oil Co. v. FTC, *supra.* "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." 15 U.S.C. § 45(c). It is not the province of our court, in reviewing FTC findings, to substitute its own appraisal of the testimony and to pick and choose among uncertain and conflicting infer-

ences. "Statute and decision * * * forbid that exercise of power." FTC v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655 (1934) (Citation omitted.); Stauffer Laboratories, Inc. v. FTC, 343 F.2d 75, 80 (9th Cir. 1965).

Here, we have a determination of a conspiracy to fix prices. It would be "naive," as Judge Barnes wrote for our court in Esco Corp. v. United States, 340 F.2d 1000, 1006 (9th Cir. 1965), "to believe that a formal signed-and-sealed contract or written resolution would conceivably be adopted at a meeting of price-fixing conspirators in this day and age. In fact, the typical price-fixing agreement is usually accomplished in a contrary manner."

■ Petitioners contend that the FTC erred in finding and holding that a conspiracy existed *solely* upon evidence of general discussions of price levels occasioned by and occurring during discussion of collective bargaining for labor union contracts. They also contend that the FTC erred in determining, upon the *sole* basis of simultaneous or nearly simultaneous price increases, that a conspiracy to set and fix prices existed. We do not believe that the FTC so found and so held. It seems anomalous that petitioners would contend that there were two "sole" bases for the FTC's finding of a conspiracy to raise, set, and fix prices. It is quite true that "even 'pure' conscious parallelism of prices is, standing alone, not unlawful. Nor is an individual competitor's sole decision to follow a price leadership, standing alone, a violation of law." Esco Corp. v. United States, 340 F.2d at 1007. It is of some significance here that at no time was a decrease in price by one of the wholesalers or retailers joined in by all his fellows nor was any such decrease of an enduring nature. The contrary was true when prices were increased. We see more than mere conscious parallelism and the use of the Bakers' forum for the discussion of prices. The vigorous activity of the secretary of Bakers cannot be ignored. His acts were committed under the color of his official authority,

and while all those involved apparently knew of his endeavors, none voiced objection to his attempts to keep prices in line by all means chosen by him. In the activities which concern us, he was the agent of the association, and the association was the agent of its members.

Safeway contends that it stands apart, that there was no substantial evidence that it participated in the conspiracy. It points to the facts that it was not a member of Bakers and that it charged one cent per loaf less for its house brand of bread than was the prevailing price on the other brands. The existence of the price differential did not compel the Commission to find that Safeway was not a conspirator. See FTC v. Sun Oil Co., 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed. 2d 466 (1963). It may have been inferred that Safeway enjoyed a position disempowering others to prevent its reducing its price or that it merely followed the common practice of many chains in charging less for items sold under house labels, or both. As to its nonmembership in Bakers, the record reveals that Safeway directly paid to Bakers' secretary the sum of $600 per year, an amount equivalent to the maximum annual dues charged for Bakers' members. While Safeway claimed that the consideration was the secretary's individual representation in its labor matters, the Commission was free to infer otherwise.

"Once the existence of the common scheme is established, very little is required to show that defendant became a party—'slight evidence may be sufficient to connect a defendant to it.' Nye & Nissen v. United States, 168 F.2d 846, 852 (9th Cir. 1948), affirmed 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919." Hernandez v. United States, 300 F.2d 114, 121–122 (9th Cir. 1962). (Footnote omitted.) Our court made the quoted pronouncement in a criminal case, wherein the Government's burden of proof was greater than that which here rested upon the Commission. As to the alleged conspiracy itself, we hold that there was evidence which, with its inferences, was sufficiently substantial to support a determination that the petitioners "had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement, * * *." American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). See also, Continental Baking Co. v. United States, 281 F.2d 137 (6th Cir. 1960). We also hold that there was substantial evidence to support findings that each of the petitioners, including Hoyt, a Hansen officer and Bakers' vice-president, participated.

■ Continental alleges error in the denial of its motion to disqualify Commission Chairman Dixon from participating in the proceeding. Dixon became chairman of the FTC in March, 1961. In 1959, in his then capacity as Chief Counsel and Staff Director of the Antitrust and Monopoly Subcommittee of the United States Senate, he participated in a Subcommittee hearing on administered pricing in the bread industry. He interrogated Continental's president, and it is urged that his questions suggest such a fixed view on one aspect of the present controversy that we should overrule the Commission's determination that he was not disqualified. Continental points to one of the questions which Dixon put to its president in 1959, which was, "You don't want to leave the impression that your independent plant managers have the right to make a major price change without your approval, do you?" It is claimed here that the question reveals Dixon's definite opinion that Continental's "independent" plant managers could not effect a major price change without the approval of the president. We do not agree that an attorney's personal opinion on a factual controversy may be inferred from questions he puts in the performance of his professional duty. Moreover, if the existence of an opinion which Dixon would retain for two years could be inferred from the quoted question, the answer given by Continental's president reveals that he himself agreed with the opinion claimed to have been entertained by Dixon.

Continental relies on Texaco, Inc. v. FTC, 118 U.S.App.D.C. 366, 336 F.2d 754 (1964), *vacated and remanded on other grounds*, 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965), in which it was held that Chairman Dixon was disqualified from joining in a Commission order. There, the basis was a statement made by Dixon in a speech delivered while the controversy was pending before an FTC examiner and before it had been submitted to the Commission. A disinterested reader of his speech, wrote the D.C. Circuit, "could hardly fail to conclude that he had in some measure decided in advance that Texaco had violated the Act." 336 F.2d at 760. This is a different case. There is nothing here to indicate that Chairman Dixon has "taken a position apparently inconsistent with an ability to judge the facts fairly, * * *." 336 F.2d at 764 (Washington, J., concurring in part and dissenting in part). We refuse to hold that, on the basis of the questions asked of Continental's president by Chairman Dixon, then not a member of the Commission, prior to the initiation of the present proceedings, and not including a statement of opinion as to an ultimate controverted issue which he would judge, a disinterested observer would have reason to believe that he had prejudged the dispute. See Gilligan, Will & Co. v. SEC, 267 F.2d 461, 469 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152, (1959); Texaco, Inc. v. FTC, supra, 336 F.2d at 764.

■ Dixon's disqualification was sought under the provisions of section 7(a) of the Administrative Procedure Act. It provides, " * * * Any such [presiding officer or officer participating in the decision] may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a *timely* and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case." 5 U.S.C. § 1006(a) (Emphasis added.). The motion for disqualification was not "timely." Continental became involved in this proceed-

ing in April, 1961. The Hearing Examiner's decision was issued July 20, 1962. Continental prosecuted its appeal, filed its briefs, and argued orally to the Commission, with Chairman Dixon participating, on January 9, 1963. On February 28, 1964, the Commission's decision on the merits was handed down. Not until October 21, 1964, nine months after the Commission had issued its decision and opinion, did Continental claim for the first time that Dixon was prejudiced and not qualified. Continental was always fully knowledgeable, of course, as to the extent of Dixon's participation, over five years earlier, in the Senate hearings. In these circumstances, it could not remain silent, await the decision of the Commission, and then, doubtless because of its disappointment, seek for the first time to asperse the objectivity of a quasi-judicial officer who joined in the challenged opinion.

In American Cyanamid Co. v. FTC, 363 F.2d 757 (6th Cir. 1966), it was held that Chairman Dixon was disqualified. In that case it appears that he took a much more active part in the investigation of the drug industry when he had been Chief Counsel and Staff Director of the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary of the United States Senate than he did in the hearings related to the case at bar. Furthermore, the petitioners in *American Cyanamid* filed their motions for disqualification almost immediately after their noticing appeals from the Hearing Examiner's initial decision.

Petitioners Langendorf, Hansen, and Hoyt contend that the Commission erred in taking official notice and incorporating in the record findings made in another Commission proceeding, In re Continental Baking Co., Dkt. 7630, October 27, 1959. These three petitioners were not parties to that proceeding. They urge that the taking of such official notice was in violation of sections 7(c) and 7(d) of the Administrative Procedure Act, 5 U.S.C. § 1006(c), (d), and the Fifth Amendment. Safeway also complains. Continental argues that the tak-

ing of such official notice was error because the issue to which that testimony was addressed was central and disputed in the present controversy and because the Commission adhered to its reliance after Continental had "proved" facts to the contrary.

The question relates to compliance with section 1006(d), which provides in pertinent part, "Where any agency decision rests on official notice of a material fact not appearing in the evidence in the record, any party shall on timely request be afforded an opportunity to show the contrary."

▪ While all parties were given the "opportunity," only Continental chose to attempt to show the contrary to the matter officially noticed. The remaining petitioners, not having followed the statutory requirement, must be held to have waived objections.

The officially noticed material came from a Hearing Examiner's decision involving Continental, which was then, in 1959, charged with illegal price discriminations and discriminatory payments in violation of 15 U.S.C. § 13(a), (d). Continental had been accused of granting discriminatory price concessions and discriminatory promotional allowances to certain favored customers. The Examiner's decision was that the complaint should be dismissed, and his decision was affirmed by the FTC on December 31, 1963. The noticed matter related to the structure and operation of Continental's business. It included, as is recited in the Commission's opinion, corporate organization, territorial assignments, purchasing, production, pricing, money collected from sales, accounting, personnel, insurance, engineering, vehicles, sales, labor relations, packaging, and advertising.

The Commission included the material in its opinion as foundation for its conclusion that Continental's operation in the State of Washington was "in commerce." Couching the conclusion on this point in terms of the Supreme Court decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), the Commission wrote,

"Its local sales agent can easily agree to deliver on consignment a dozen loaves of 'Wonder' bread every Monday, but 'innumerable transactions,' many of them directly 'in' interstate commerce, are 'necessary to performance.' The work of Continental's driver-salesmen is merely the peak of the iceberg; beneath it, sunk deep into the stream of interstate commerce, is the real body of the transaction.

"We find that all of Continental's sales in the State of Washington were 'in' interstate commerce. All of them involved a New York seller and a Washington buyer. Each of them was an indivisible part of a host of 'transactions * * * [that] constituted a single continuous chain of events, many of which were multistate in character, and none of which, * * * could possibly have been continued but for that part of them which moved back and forth across state lines.' South-Eastern Underwriters, supra, 322 U.S. at 537 [64 S.Ct. 1162, 88 L.Ed. 1440]."

▪ We have already expressed our opinion that the jurisdiction of the Commission was properly founded upon the interstate, Alaskan sales. Since the Commission's application of the officially noticed material was obviously limited to an alternative basis of jurisdiction, it is unnecessary to dwell upon the propriety of the reliance.

Petitioners contend that Flotill Prods., Inc. v. FTC, 9 Cir., 358 F.2d 224, decided by a panel of our court on March 15, 1966, requires a remand to the Commission.

In *Flotill,* only two of the three participating members of the Commission voted affirmatively for the challenged order. Our court held that a majority of the five-member Commission must join in issuing a valid order and remanded the case to the Commission. The case was resubmitted to the court en banc and the panel decision sustained with four of our nine judges dissenting. 358 F.2d 234.

In the present proceeding the Commission made two decisions. The first, ordering the petitioners to cease and desist from fixing prices, was issued by a three-to-one vote. It was held that an unfair act or practice was shown by the record, that all respondents below were legally responsible therefor, and that the Commission had jurisdiction under section 5 of the Federal Trade Commission Act to issue a cease and desist order. Thereafter, upon Continental's motion, the Commission stayed the issuance of its order and remanded the case to the Hearing Examiner to permit Continental to attempt to prove the contrary of the officially noticed facts. After further hearings, and despite an attempted showing of facts contrary to those officially noticed, the Commission by a two-to-one vote affirmed its original decision and directed that

the order issued by the three-to-one vote be made effective.

■ Continental says that *Flotill* "requires the remand to the Commission for further consideration of the question decided by less than a majority of the Commission—that an unfair act or practice *in commerce* was established." We disagree. Our decision as to the existence of the "in commerce" requirement of the Act is based upon the interstate character of the activities resulting from the Alaskan sales and not upon the possible interstate nature of Continental's overall operations. Thus, though *Flotill* would perhaps be applicable if we sustained the Commission's alternate ground for its exercise of jurisdiction, the decision is of no present consequence.

■ Finally, petitioners challenge the scope of the cease and desist order, quoted below,[4] as being excessively and

4. "ORDER

IT IS ORDERED that the respondent Bakers of Washington, Inc., an incorporated association, and respondents George B. Buchan, Richard Hoyt, and Arthur H. Lalime, individually and as officers of respondent association, and their representatives, agents and employees, directly or through any corporate or other device, in or in connection with the offering for sale, sale or distribution of bread, do forthwith cease and desist from:

Entering into, carrying out, continuing or cooperating in any planned common course of action, understanding, agreement, combination or conspiracy between or among any two or more of said respondents, or members of Bakers of Washington, Inc., or between any one or more of them and others not parties hereto, where any one or more of the parties to that planned common course of action, understanding, agreement, combination or conspiracy is selling bread in interstate commerce in competition with bread sold by any one or more of the other parties thereto, or do or perform any of the following things:

(1) Establish, fix or maintain prices, terms or conditions of sale of bread,

(2) Adhere to any prices, terms or conditions of sale so fixed or maintained, or

(3) Deter or attempt to deter any competitor from exercising his individual

judgment as to prices, terms or conditions of sale of bread.

IT IS FURTHER ORDERED that the respondents Buchan Baking Co., Continental Baking Company, Langendorf United Bakeries, Inc., Hansen Baking Co., Inc., Trenerry's Bakery Co., and Snyder's Bakery, Inc., corporations, John M. Larson, trading as Larson's Bakery, and Vic H. Goethals, trading as Fortune's Bakery, all members of respondent association, and the following members of said association, not named as respondents herein, Ashbrook Bakeries Corp., 1407 11th Avenue, Seattle, Washington; Albertson's, Inc., 17000 Aurora Avenue, Seattle; Baders' Dutch Bakeries, 3755 University, Seattle; Baker Boy Bakery, 8050 Bothell Way, Seattle; Bake-Rite Bakery, 1414 14th Avenue, Seattle; Bellinger Bakery, North Bend; Best Pie Company, Inc., 132 Queen Anne Avenue, Seattle; Big Four Donut, Inc., 319 Nickerson Street, Seattle; Blake's Bakery, Inc., 4729 California Avenue, Seattle; Bookter's Seattle Bakery, Inc., 3409 4th Avenue South, Seattle; Butter-Krisp Bakery, Inc., 2203 23rd Avenue South, Seattle; Boldt's Western Hotels Food Service, Inc., Boeing Cafeteria, Boeing Plant #2, Seattle; Carolyn's Cakes, 518 15th Avenue North, Seattle; Caster's Lake City Bakery, 12532 Bothell Way, Seattle; Frederick & Nelson (Bakery Department), 5th at Pine, Seattle; Gai's Seattle French Baking Co., Inc., 2006 Weller Street, Seattle; Golden Rule Bakery, Inc., 4450 Fremont

unreasonably broad. In our judgment the order withstands the challenge. We are taught that "unless the remedy bears no reasonable relation to the existing unlawful practices, the Commission's discretion as to the scope of the order should not be disturbed. Federal Trade Commission v. National Lead Co., 1957, 352 U.S. 419, 428–429, 77 S.Ct. 502, 1 L.Ed.2d 438." Gellman v. FTC, 290 F.2d 666, 670–671 (8th Cir. 1961). It can hardly be denied that the challenged

Avenue, Seattle; Grandma Cookie Baking Co., Inc., 3402 Wallingford Avenue, Seattle; Karl's Bakery, 1614 Hewitt Avenue, Everett; Kent Bakery, 213 First South, Kent; Lippman's Bakery, Inc., 119 23rd Avenue, Seattle; Lindsay's Thriftway Market, 11100 Roosevelt Way, Seattle; Manning's, Inc., 621 Seaboard Building, Seattle; Richard's Fried Pies, Inc., 220 1st Avenue North, Seattle; Swiss Pastry & Candy Shop, 1325 5th Avenue, Seattle; Smith & Sonnleitner Cookie Co., 1238 No. 99 W., McMinnville, Oregon (7710 Bagley, Seattle, Washington); Van de Kamp's Holland Dutch Bakers, 823 Yale Avenue North, Seattle; Grand Central Bakery, Market & H Streets, Aberdeen; Swanson's Foods, Inc., 1401 Simpson Avenue, Aberdeen; Veldkamp's Olympic Bakery, 417 W. Wishkah Street, Aberdeen; Bame's Ye Olde Home Bakery, Riverside, Mount Vernon; Bellingham Baking Company, 2001 State Street, Bellingham; City Bakery, 607 1st Street, Mount Vernon; Thrifty Foods, 130 Fairhaven Avenue, Burlington; Golden Rule Bakery, Inc., 915 Center Street, Tacoma; Jordan Baking Company, 3623 S. 54th Street, Tacoma; Eddy Bakeries Company, Inc., 232 S. Front Street, Yakima; Sigman Food Stores, P. O. Box 618, Yakima; Miss Maud Pemberton, Golden Rule Bakery, Inc., 4450 Fremont Avenue, Seattle; Henry Richards, Continental Baking Company, P. O. Box 3227, Seattle; Lloyd C. Mitchell, Van de Kamp's Holland Dutch Bakers, 823 Yale Avenue North, Seattle; Lou Blackfield, Bake-Rite Bakery, 1414 14th Avenue, Seattle; Horace Snyder, Snyder's Bakery, Inc., 31 North 4th Street, Yakima; Al Moore, Langendorf United Bakeries, Inc., 2901 6th Avenue South, Seattle; Roy Reynolds, Grandma Cookie Baking Co., Inc., 3402 Wallingford, Seattle; LeConie Stiles, Jr., Ashbrook Ruth Bakeries Corp., 1407 11th Avenue, Seattle; Henry Gai, Seattle French Baking Co., Inc., 2006 Weller Street, Seattle; Donald R. Due, Best Pie Company, Inc., 132 Queen Anne Avenue, Seattle; and Maurice Bybey, Baker Boy Bakery, 8050 Bothell Way, Seattle; and their representatives, agents and employees, directly or through any corporate or other device, in or in connection with the offering for sale, sale or distribution of bread, do forthwith cease and desist from:

Entering into, carrying out, continuing or cooperating in any planned common course of action, understanding, agreement, combination or conspiracy between or among any two or more of said respondents, or members of Bakers of Washington, Inc., or between any one or more of them and others not parties hereto where any one or more of the parties to that planned common course of action, understanding, agreement, combination or conspiracy is selling bread in interstate commerce in competition with bread sold by any one or more of the other parties thereto, to do or perform any of the following things:

(1) Establish, fix or maintain prices, terms or conditions of sale of bread,

(2) Adhere to any prices, terms or conditions of sale so fixed or maintained, or

(3) Deter or attempt to deter any competitor from exercising his individual judgment as to prices, terms or conditions of sale of bread.

"IT IS FURTHER ORDERED that Safeway Stores, Inc., and Holsum Baking Company, corporations, respondents, but not members of the respondent association, and their representatives, agents and employees, directly or through any corporate or other device, in or in connection with the offering for sale, sale or distribution of bread, do forthwith cease and desist from:

Entering into, carrying out, continuing or cooperating in any planned common course of action, understanding, agreement, combination or conspiracy between or among any two or more of said respondents, or members of Bakers of Washington, Inc., or between any one or more of them and others not parties hereto, to do or perform any of the following things:

(1) Establish, fix or maintain prices, terms or conditons of sale of bread,

(2) Adhere to any prices, terms or conditions of sale so fixed or maintained, or

(3) Deter or attempt to deter any competitor from exercising his individual judgment as to prices, terms or conditions of sale of bread."

order bears a "reasonable relation" to the practices found by the Commission to have been unlawful.

In FTC v. Colgate-Palmolive Co., 380 U.S. 374, 392, 85 S.Ct.1035, 13 L.Ed. 2d 904 (1965), the Supreme Court repeated its opinion in FTC v. Cement Institute, 333 U.S. 683, 726, 68 S.Ct. 793, 1046, 92 L.Ed. 1010 (1948), that "an order's prohibitions 'should be clear and precise in order that they may be understood by those against whom they are directed,' * * *" 380 U.S. 392, 85 S.Ct. at 1046. Here the Commission has directed that the petitioners shall not engage in a conspiracy to

"(1) Establish, fix or maintain prices, terms or conditions of sale of bread,

(2) Adhere to any prices, terms or conditions of sale so fixed or maintained, or

(3) Deter or attempt to deter any competitor from exercising his individual judgment as to prices, terms or conditions of sale of bread."

To us, these injunctions seem clear, and we are unable to accept the contention that they are so imprecise as not adequately to warn a reasonable man of the prohibited activities in which he shall not continue to engage.[5]

"It has been repeatedly held that the Commission has wide discretion in determining the type of order that is necessary to cope with the unfair practices found, e. g., Jacob Siegel Co. v. Federal Trade Comm., 327 U.S. 608, 611, 66 S.Ct. 758, 90 L.Ed. 888, and that Congress has placed the primary responsibility for fashioning orders upon the Commission, Federal Trade Comm'n v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 1 L.Ed.2d 438. For these reasons the courts should not 'lightly modify' the Commission's orders. Federal Trade Comm'n v. Cement Institute, 333 U.S. 683, 726, 68 S.Ct. 793, 92 L.Ed. 1010."

FTC v. Colgate-Palmolive Co., supra, 380 U.S. at 392, 85 S.Ct. at 1046.

■■■ Some of the petitioners claim that the order is overbroad because it would regulate their conduct throughout the nation even though the activity found to be illegal took place in only one area of the country. We do not believe the complaint is justified. Since the order is sufficiently specific and since it prohibits only conduct which is *per se* illegal under the Act, we do not think it is objectionable simply because its application is made as broad as petitioners' business activities. As the Commission concluded, "there is no reason to suppose that an entity showing no reluctance to fix prices in Seattle, Washington, would act differently in another city or another state" in which it does business. In a comparable situation the Court of Appeals for the Fourth Circuit stated, "As to territorial extent, the company, having been found guilty of a flagrant violation of the act, was properly required to cease and desist from such practices in all areas in which it was doing business." Maryland Baking Company v.

---

5. Commissioner Elman, dissenting, believed the order to be insupportably broad. He suggested that the order should have been made so specific as

"to forbid not only the conspiracy itself but also the specific acts and practices upon which the effectiveness of the conspiracy—its translation into actual anticompetitive conduct—depends."

Commissioner Elman continued,

"It is immaterial that these acts and practices may be lawful in themselves; the Commission has ample power to forbid them if necessary to ensure that the conspiracy will cease and not be resumed. F.T.C. v. National Lead Co., 352 U.S. 419, 430 [77 S.Ct. 502, 1 L.Ed. 2d 438]."

We agree that the Commission, applying its expertise, might have properly chosen to issue an order containing prohibitions against specific acts. Obviously, however, it determined that there was no pressing need that it do so. We would not order the Commission to amend its order so as to impose upon the petitioners specific prohibitions more severely restrictive than the Commission, from its review of the evidence, believed to be required.

Federal Trade Commission, 243 F.2d 716, 718 (4th Cir. 1957). See also, Foremost Dairies, Inc. v. Federal Trade Commistion, 348 F.2d 674 (5th Cir. 1965).

Affirmed.