**KENNECOTT COPPER CORPORA-
TION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION,
Respondent.**

No. 71–1371.

United States Court of Appeals,
Tenth Circuit.

Sept. 15, 1972.

Rehearing Denied Oct. 13, 1972.

Roy H. Steyer, of Sullivan & Cromwell, New York City (Arthur H. Dean, John L. Warden and Barrington D. Parker, Jr., of Sullivan & Cromwell, New York City, William Simon, John Bodner, Jr. and Francis A. O'Brien, of Howrey, Simon, Baker & Murchison, Washington, D. C., Winston S. Howard, and Hugh A. Burns, of Dawson, Nagel, Sherman & Howard, Denver, Colo., on brief) for petitioner.

Montgomery K. Hyun, Atty., Federal Trade Commission (Ronald M. Dietrich, Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Counsel, and Frederick H. Mayer, Atty., Federal Trade Commission, on brief) for respondent.

Before HILL, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## I.

## INTRODUCTION

The matter before us is the petition of Kennecott Copper Corporation seeking review of a divestiture order issued by the Federal Trade Commission. Kennecott, a New York corporation, is engaged in the production of copper and industries related to this. It is a producer, smelter, refiner and fabricator of copper and other metal products. It acquired Peabody Coal Company, an Illinois corporation, which is one of the two leading coal producers and distributors in the United States. A tentative agreement for this acquisition was signed July 1, 1966, and the final agreement providing for the acquisition was signed on March 17, 1967. On or about March 29, 1968, the transaction was closed, Kennecott paying 285 million dollars in cash and assuming 36.5 million dollars in liabilities and subject to the reservation of a production payment from Peabody's coal properties which was sold by Peabody for about 300 million dollars in cash.

On August 5, 1968, the Federal Trade Commission issued its complaint alleging a violation of § 7 of the Clayton Act as amended, 15 U.S.C. § 18.[1] Trial was thereafter had before a hearing examiner in New York, San Francisco and Salt Lake City on 48 hearing days extending from January to June 1969. Numerous witnesses testified, the record consisting of more than 6,000 pages of testimony together with some 450 documentary exhibits. In addition to the expert witnesses, there was testimony from coal company executives, utility company officials and economists. Following this trial the hearing examiner, in March 1970, issued lengthy findings and conclusions and determined that the complaint should be dismissed.

The pivotal question in the case was whether prior to the merger Kennecott was a recognized potential entrant into the coal producing business and whether the elimination of Kennecott by its purchase of Peabody may have substantially lessened competition or tended to create a monopoly. The examiner found that the evidence failed to establish that there was a likelihood that Kennecott would enter into the coal business from an internal expansion or by expansion from a limited base, but that Kennecott was a potential entrant by acquisition. He further found, however, that even if

---

1. This section provides as follows:

No corporation engaged in commerce shall acquire, directly or indirectly, . . . the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

Kennecott were regarded as a recognized potential entrant, the questioned acquisition would not have the effect which the complaint alleged, since the coal industry was found by him not to have been highly concentrated but rather to have been competitively structured. The examiner further found that there were numerous other potential entrants into the sale of coal, all of whom had special capabilities, and thus the elimination of a single potential competitor would not be significant. The examiner also based his conclusion on the fact that even though the production market was limited to coal, there was some degree of cross-elasticity of demand for coal and other fuels, and this factor was determined to contribute to his conclusion that the elimination of a single potential competitor was lacking in significance.

The Federal Trade Commission issued its decision reversing the examiner on May 13, 1971. The Commission concluded that Kennecott was indeed a substantial potential entrant and that the removal of Kennecott from this position on the threshold of the industry removed a potential competitor and had the effect of substantially lessening competition. The Commission determined that although the coal business was not at the time of the filing of its opinion in May 1971 a concentrated market, that it was nevertheless trending in that direction and that this tendency would continue in the future. It concluded that it was obligated to deal not only with present threats to competition but also with future threats in their incipient stages rather than to await the concentrated condition. The Commission cited another basis and that was Kennecott's deep pocket operating on a market which, though a loose oligopoly, is growing more concentrated. The Commission saw a likelihood of diminishing competition resulting from the merger of the great economic resources of Kennecott and Peabody.

In urging that the order of the Commission be reversed, Kennecott argues, first, that the Commission erred in holding that the relevant market was the entire United States and in refusing to consider competition which coal had with the other fuels, including nuclear energy, oil and gas. Secondly, that the Commission erred in holding that Kennecott was the most likely entrant into the coal business and in holding that the coal industry, although now a loose oligopoly, is trending toward a highly concentrated market and in failing to hold that the coal market is competitively structured and likely to remain so. It is further contended that the Commission erred in failing to address the issue whether the elimination of Kennecott as one of many potential entrants into a competitive industry had the effect of substantially lessening competition.

Further contentions are that the Commission violated standards of administrative adjudication in setting aside the hearing examiner's findings and in not making adequate findings of its own and in adopting the so-called deep-pocket theory, it being Kennecott's contention that this was not presented before the Commission. Complaint is also made that the hearing was not fair in that the Commission issued certain statements to Congress contemporaneously with the carrying out of the proceedings, which statements were said to be inconsistent with the Commission's findings and conclusions. It is also contended that one of the commissioners should have been disqualified because of her alleged prejudgment of the case.

II.

THE PRODUCT MARKET

The Commission found that the relevant line of commerce consisted of bituminous, sub-bituminous and lignite coal and in that respect endorsed the view expressed by the examiner. However, the Commission rejected the examiner's finding that:

Factually, legally, and pragmatically, it is reasonable, therefore, to consider coal as the product market and at the same time to take into account the competition that other fuels offer to coal.

The Commission said:

Coal, in our view, is clearly a relevant product market for antitrust purposes, separate and distinct from other fuels, by virtue of the fact that coal has unique characteristics which are commercially significant and a technology obviously different from such power sources as gas or nuclear energy.

The examiner did not rule that coal does not constitute a product market in and of itself. He merely noted the market interplay between coal and other fuels. The examiner's determination that nuclear energy and natural gas competition should be considered was largely based on the competition which is shown to exist in the generation of electrical energy by utility companies, and unquestionably in this area of economic activity coal is in direct competition with other fuels, and so it seems reasonable to consider as did the examiner the competition that exists between coal and other fuels, at least in the mentioned context.

### III.

### THE RELEVANT GEOGRAPHIC MARKET

■ The Commission correctly found that the nation as a whole constitutes a relevant geographic market, based as it is on the Commission's analysis that the large coal companies compete with each other throughout the United States, plus the fact that Kennecott fully intended to become a nationwide competitor. The Commission cited United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) in support of this finding and conclusion and, particularly, the Supreme Court's approval of general testimony in proof of the geographic market.

As we view it, the Commission's finding was not contrary to the record in this case, for although coal reserves are not found in all the states of the union, such reserves are found in virtually every section of the country, and more and more the market is acquiring a national character.

### IV.

### KENNECOTT COPPER CORPORATION

Kennecott was shown to have been formed in 1915 and has been engaged in the mining of copper and associated metals since. It is the largest copper producer in the United States accounting for approximately 33 percent of the 1,-372,000 tons shown to have been produced in 1966. It also produces molybdenum, silver, gold, lead and zinc. It owns and operates mines in the United States under the direction of its Western Mining Divisions. One of these is in Utah, another in Nevada, one in Arizona and one in New Mexico. A fifth mine is located in Chile, but in 1967 it was forced to sell 51 percent of its interest in this mine in Chile to the government.

Prior to the acquisition of Peabody, Kennecott devoted itself to the mining and production of copper and its by-products. In its process it uses a tremendous amount of electricity, and for the most part has its own generating plants and, of course, consumes a great amount of fuel, both natural gas and coal. It sometimes sells some of this electrical energy.

Its total assets are well over a billion dollars, and its income is substantial. It is rated 55th among United States industrial corporations in terms of assets and 111th in terms of sales.

The evidence established that Kennecott entered the coal business basically because of the fact that its copper reserves were dwindling. It concluded that it had a limited future in the mining and production of copper because of the limited sources within the United States and that it is thus engaged in a liquidating process. Its cash reserves were increasing and it foresaw that these would reach about one billion dollars in 1980 and so diversification was essential.

It first explored the possibility of getting into the oil business, and during the

years 1963 and 1964 made a careful inquiry, looking to the acquisition of a going oil concern. After studying this possibility, it abandoned this oil quest and turned to the coal business. Meanwhile, in 1963, it had purchased the Knight Ideal Coal Company in Utah. Although this company had considerable reserves it was a small concern and its production was very limited. This property was shown to have been purchased so as to gain reserves which would provide a hedge against rising natural gas costs, but also with the thought in mind, according to the evidence and the finding (of the examiner), of engaging at least to some extent in the coal business.[2]

It was the interest in coal which started with the Knight Ideal purchase that led to the focus on Peabody. Undoubtedly it was the difficulties in starting from scratch which led to this decision. A very careful study preceded the step, it having been previously determined that the Knight Ideal property was not a satisfactory base for getting into the coal business. Peabody was not only a going concern but the very largest coal producer with extensive reserves which were well located, and also with transportation facilities. The acquisition was finally completed on March 29, 1968, on which date Kennecott, through its subsidiary, acquired the business and substantially all of the assets of Peabody.

## V.

### PEABODY COAL COMPANY

As previously stated, Peabody was one of the two leading producers of coal in the United States. In 1966 it was shown to have produced approximately 52.8 million tons of coal, or approximately 10 percent of the total produced domestically. In addition, it sold 8.3 million tons of coal produced by others. In 1967 its total production was 59.4 million tons, considerably more than the next leading producer, Consolidation Coal Company. Its reserves were over five billion tons.

It had coal reserves in states in the southwest, west, midwest and east-central regions of the United States. It was shown to have been aggressively expanding its marketing areas with long-term contracts, mostly to utility companies.

The examiner further found:

During 1966, Peabody and its subsidiaries had coal sales and other revenues of $233,923,483 that provided a net income of $26,279,973. Total consolidated assets of Peabody as of December 31, 1966, were $315,629,163. Peabody's rate of return on stockholders' investment during 1966 was 14.6 percent. Among United States industrial corporations listed in "Fortune's 500" for 1966, Peabody ranked 186th in terms of assets and 317th in terms of sales.

At all times relevant to this proceeding, Peabody has sold and has shipped its products in interstate commerce and has been engaged in "commerce" within the meaning of the Clayton Act.

In addition to its domestic operations, Peabody owned 58 percent of an Australian company that operated a large metallurgical (coking) coal mine in Australia. Most of its output was sold to the Japanese steel industry.[3]

## VI.

### THE COAL INDUSTRY

The evidence showed that coal had been a dying industry prior to the 1950's.

2. The examiner wrote:

Although the foregoing evidence demonstrates (1) that the Knight Ideal project developed in negation of the broad coal diversification study originally proposed and (2) that it was closely associated with Kennecott's own fuel needs, the record also makes clear that WMD viewed the project as pre-

liminary to the production and sale of coal on a commercial basis and that while it was being developed, it was consistently so presented without any suggestion of a contrary view on the part of management in New York.

3. A more detailed history and analysis of Peabody Coal Company is appended hereto and is marked Appendix II.

During the post-World War II period (starting in 1947) the number of coal companies declined considerably, and there has been a more gradual decline in the number of the larger coal companies.

During the period from 1948 to 1958 the coal industry was on the decline. However, from 1959 forward there has been a considerable upsurge, notwithstanding that domestic consumption declined, railroad use declined and general manufacturing use of coal declined; consumption of coal in the electrical utility industry increased markedly. This increase in consumption (by electrical utilities) was considerable—86 million tons in 1947 to 272 million tons in 1967. This phenomenal increase in sales to utilities has been attributable to more efficient coal production methods, including mining techniques and general mechanization. Transportation methods have also improved, and the net result has been that the coal industry has been able to compete successfully with gas and other energy sources for use in the generating plants. All of this is noted in the findings of the Commission which declares that by the year 2000 it is expected that coal consumption by electric utilities will reach 755 million tons.[4]

The Commission has noted that despite the expansion the market has tended to become concentrated:

Notwithstanding the ever growing demand for, and the concomitant expansion of production of, coal, the industry is experiencing a steady trend toward rising concentration. In 1947, there were 68 firms producing more than one million tons of coal annually. In 1947, their share of the domestic coal production amounted to 48 percent; by 1967, it reached 70 percent. During the period 1954 to 1967, the top four companies increased their share of production from 15.8 percent to 29.2 percent. While during the

same period the market expanded by 40.9 percent, the share of the top four companies grew by 160.5 percent. Further, the top four firms accounted for 63 percent of the total market expansion. This trend, unless halted, foreshadows ominous developments in the coal industry, with production and sale of coal concentrating in fewer and fewer hands. Cf. United States v. Von's Grocery Co., 384 U.S. 270, 273, 274, 276–[277, 86 S.Ct. 1478, 16 L.Ed. 2d 555] (1966).

One noteworthy fact is that the coal reserves are being bought up by the oil companies and other large corporations, including Standard of Ohio, Gulf Oil, Bethlehem Steel, General Dynamics, U.S. Steel and Republic Steel. For example, the second largest coal company, Consolidated, is owned by Continental Oil Company. The chart appended hereto shows this ownership in relation to the individual and total production of the several producers which exceeded three million tons in 1967.

It is thus apparent that the coal industry has changed in many respects in recent years. First of all, Peabody's growth has been remarkable. It has, in a ten-year period, from 1955, increased its sales from 19 million tons to 60 million tons per year. On this question, the Commission found that of the increase in domestic production in this ten-year period of 88 million tons, Peabody accounted for 45 percent of the increase. In 1965 Peabody accounted for 90 percent of the total domestic increase.

The total market share of the four largest firms, according to the findings of the Commission which are supported by the evidence, rose from 15.8 percent in 1954 to 29.2 percent in 1967, and the top eight companies increased their market share from 23.6 percent to 39.7 percent in the same period. Both the top four and top eight companies experienced phenomenal disproportionate growth in this period.

4. It is noteworthy that contracts with electric utilities are long-term, generally for the life of the utility plant, which fact serves to stabilize the coal production and to enable it to systemize its distribution facilities.

A number of factors militated against new entry into the coal business. The fact that the big demand was for consumption by utility companies involving long-term contract, extensive reserves and ready ability to deliver all contributed. Thus, experience, know-how and equipment are essentials.

There is, of course, no lack of demand for coal. The oil companies are, which has been shown, likely purchasers of coal reserves, but not necessarily with a view to entering the coal business, although some of them have done so. Rather, the oil companies are concerned with a possible source of petroleum and petroleum products. Therefore, the coal market as such, although perhaps not concentrated at the time of trial, is headed in that direction. As the Commission points out, it seems inevitable that the market shares will, to an increasing extent, go to the top producers in the industry not only because of their reserves but also because of their productive capacities, transportation facilities, expertise in extraction and marketing and, of course, because of their great resources which are shown to be essential to the coal business in it present and foreseeable future form.

Kennecott tries to turn these facts to its advantage, pointing out that substantial concerns like Continental Oil Company, Occidental Petroleum, U.S. Steel, Gulf Oil and Standard Oil of Ohio operate as a stabilizing factor in the competition picture and furnish some assurance that Peabody and Kennecott will not simply because of Kennecott's resources make any great impact.

## VII.

### ANALYSIS OF THE ISSUES

We are called on to determine whether the Commission was correct in holding that Kennecott was a most likely entrant into the coal business and, indeed, a more likely entrant than other forms, including the major oil and gas companies, railroads and utilities. We must also appraise the Commission's holding that the coal industry is presently a loose oligopoly which is moving at an accelerated rate toward a highly concentrated condition and is not, as Kennecott maintains, an industry which is competitively structured and likely to remain so in the future.

We must also consider the Commission's holding that there is a dearth of potential new entrants into the coal business and, further, whether the elimination of Kennecott had the effect of substantially lessening competition.

The remaining question of substance is whether the Commission erred in its conclusions as to the probable effects of the acquisition on competition and particularly in its conclusion that the special circumstances of the merging companies in relationship to the concentrated market may be substantially to lessen competition or to tend to create a monopoly.

## VIII.

### KENNECOTT AS A MOST LIKELY ENTRANT

This is an unusual merger case in that it is neither a horizontal nor a vertical merger such as the courts have most frequently considered. Nor is it a product extension merger such as that in Federal Trade Commission v. Procter & Gamble Company, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). This latter type has distinct characteristics, although it is more similar to the conglomerate type merger which we have here than it is to the horizontal and vertical. It is also unusual in that it brings together the two largest companies in their respective industries. However, as was said by the Supreme Court in Procter & Gamble, 386 U.S. at 577, 87 S.Ct. at 1229:

All mergers are within the reach of § 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate or other. * * *

A conglomerate merger was defined in *Procter & Gamble* as being one in which there are no economic relationships between the acquiring and the acquired firm.

■ Since this was a conglomerate merger there existed little direct economic relationship between the two firms, although Kennecott was shown to have been a substantial consumer of coal and was thus a potential customer. It was also shown to have been a potential coal producer, and thus in its latter capacity had at least some competitive relationship to Peabody and to the industry. Nevertheless, the facts are peculiar in that Kennecott was not at the time of the acquisition directly engaged in coal production so that the merger did not have the effect of removing a direct and active competitor. But this is a factor which will be present in every conglomerate merger case, and it does not serve to remove the merger from the scope of § 7 of the Clayton Act; neither does it necessarily result in the use of different criteria, although it must be conceded that the criteria applicable to the horizontal merger furnish limited help in judging the validity of the conglomerate acquisition.[5] To the extent that these economics criteria are helpful they should, of course, be employed.[6]

■ Still another differentiating unusual factor is that the market here is not presently an oligopolistic one. The Commission's decision is based on its predictions derived from the evidence that the market would become a tight oligopoly if action were not taken at what it considered to be the incipient stage. In the light of the general objectives of the Act we perceive no error in the Commission's approaching the case on the basis of assessing probabilities rather than present conditions. The Act contemplates this.

A. The Commission's Potential Competition Concept.

The actual terms of § 7 of the Clayton Act, as amended, sometimes called the Celler-Kefauver Act, are addressed not only to conditions which are presently apparent but contemplate the prevention of mergers which will lessen competition in the future. Section 7 has been frequently employed in the merger case. See United States v. El Paso Natural Gas Company, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. Penn-Olin Chemical Company, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); Federal Trade Commission v. Procter & Gamble Company, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); and see also United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) and United States v. Von's Grocery Company, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).

Ordinarily the potential competition concept comes into play where the indus-

---

5. See Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv. L.Rev. 1313, 1362 (1965):

Even though an acquiring company has not been a direct competitor in the acquired firm's industry, a conglomerate acquisition may diminish competitive influences from outside the market that might otherwise exist. Such adverse effects may come about in three different ways. First, as previously discussed, the acquisition may diminish potential competition by raising barriers to entry. Second, a conglomerate acquisition may remove as an independent competitive force a firm that, although not actually selling in the market of the acquired firm, has had a substantial impact on the behavior of companies in that market because it was recognized as a likely entrant. Finally, the merger may involve a firm

that would actually have entered the acquired firm's market by internal expansion if the merger had not occurred. The latter two phenomena will often coincide: a firm that would have entered an industry by internal expansion will often be a firm that exerts an influence on market behavior even while it is an outsider. However, the two need not go together. It is not likely, for example, that the Ronson cigarette lighter company was recognized as a threat by the producers of electric razors before it expanded into that market. Therefore, the two possibilities deserve separate analytical treatment.

6. These are at best guides and are not to be regarded as ends in themselves. There is some apparent danger in slavish adherence to the criteria, whereby the terms and philosophy of the Act itself are submerged.

try is regarded as an oligopoly. Admittedly, the industry as it existed at the time of trial was not a tight oligopoly. Based, however, on the findings of the Commission that the industry is on its way to becoming highly concentrated, the Commission determined that it was justified in acting so as to prevent the development of a tightly concentrated industry. This approach has been generally approved in the cases. Thus, in Federal Trade Commission v. Procter & Gamble Company, *supra*, the Court said:

> [T]here is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated. 87 S. Ct. at 1229

The Court went on to say that since the important question is whether a merger may substantially lessen the competition, it is necessary to make a prediction as to the merger's impact on competition, present and future.

Also, in United States v. Penn-Olin Chemical Company, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775, it was said:

> The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines

of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated.

See also United States v. Continental Can Company, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964) and United States v. El Paso Natural Gas Company, *supra*.

*Brown Shoe Company* [7] clearly recognized that the government is not required to stay its hand until the market has reached an oligopolistic stage or condition. Thus, there is ample authority for the Commission's potential competition concept. The threat to potential competition approach can be employed in projecting the trend of the market and the probability of a future monopoly.

B. Influence of Kennecott on the Edge of the Market.

■ The Commission found that Kennecott was indeed a substantial potential entrant into the coal industry. Its interest dated back to 1963, at which time it commenced to plan an extension of its activities so as to utilize its very substantial cash reserves. In the year 1963, it acquired the Knight Ideal Coal Company and did so for the purpose of obtaining a source of coal for its own use and, secondly, for the purpose of producing and selling coal on a commercial basis. The evidence establishes that at that time the company manifested an interest in entering the coal business on

7. The dissenting opinion of Justice Stewart in United States v. Von's Grocery Company, *supra*, in commenting on Brown Shoe Company ably sums up this concept:

> Under § 7, as amended, a merger can be invalidated if, and only if, "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." No question is raised here as to the tendency of the present merger to create a monopoly. Our sole concern is with the question whether the effect of the merger may be substantially to lessen competition.
>
> The principal danger against which the 1950 amendment was addressed was the erosion of competition through the cumulative centripetal effect of acquisitions by large corporations, none

of which by itself might be sufficient to constitute a violation of the Sherman Act. Congress' immediate fear was that of large corporations buying out small companies. A major aspect of that fear was the perceived trend toward absentee ownership of local business. Another, more generalized, congressional purpose revealed by the legislative history was to protect small businessmen and to stem the rising tide of concentration in the economy. These goals, Congress thought, could be achieved by "arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." Brown Shoe Co. v. United States, supra, 370 U.S. at 317, 82 S.Ct. 1502 at 1520, 8 L.Ed. 2d 510.

384 U.S. at 283, 284, 86 S.Ct. at 1485.

a national basis. For a time, it is true, it considered entering the oil business, but even during this period did not abandon its intention to become a producer and seller of coal. Its dwindling copper reserves and the necessity for utilizing its cash surplus, together with its acknowledged and manifest interest in mining, furnished ample evidence to support the Commission's determination that it was a likely entrant. The Commission noted that the record was devoid of evidence to show that there were any other potential entrants possessing the necessary financial resources to build a substantial coal business.

Based on the evidence that Kennecott was peculiarly well qualified because of its long experience in hard rock mining and its acknowledged capabilities, its financial resources and its close proximity to the coal industry, it was found that Kennecott was not only a likely entrant but also the most likely entrant into the coal business. In this connection, the Commission noted that oil companies, natural gas companies, electric utilities and railroads are not to be regarded as likely entrants. The oil and gas companies are primarily interested in acquiring coal reserves for synthetic fuels and the sale of coal is a secondary objective. The record fully supports these findings.

C. Kennecott as a Competitor Prior to the Merger.

The Commission expressed the view that Kennecott was not only a potential entrant into the coal industry but exerted substantial influence on the market due to its interest in the coal business and its long-term plans. Its acquisition of the Knight Ideal reserves and its use of this Knight Ideal property as a lever in negotiating fuel contracts, both gas and coal, support the Commission's position; however, it is not shown actually to have engaged in the production of coal prior to the acquisition of Peabody. Peabody was shown to have been apprehensive about the possibility that Kennecott would became a producer, and in at least

one instance this was a factor in a Kennecott-Peabody negotiation for the purchase of coal. Undoubtedly Kennecott was the most likely entrant, considering its resources and capabilities, and as such it exercised influence on the market and the industry.

Much documentary evidence was introduced to show Kennecott's long-range study of the coal business. A desire to engage in the coal business was expressed by high level management officials starting in 1963. This was undoubtedly influenced by the fact that Kennecott's main experience was not only in extracting ore but also in strip mining which has become the most important extractive method in the coal industry. This was coupled with the fact that the coal business did not have a *prohibitively* high entry price as did the oil business. Finally, it offered about the only outlet for Kennecott's growing cash resources. Thus, the Commission was justified in determining that Kennecott's entry into the coal business one way or another was almost certain. There is also the factor that no other likely entrants were shown to exist. These peculiar circumstances thus exerted influence on the market which offset the factor of direct or actual competition.

D. Barriers to Entry by Expansion.

█ The evidence is clear that the coal industry had become so complex and specialized even before the instant merger that it was virtually impossible for a company with fewer resources than Kennecott to start a coal company by the acquisition of reserves and equipment. The experiences of Kerr-McGee and Utah Mining and Construction Company demonstrate that there is a basic time requirement of from 10 to 15 years to which must be added the necessity to obtain the large utility contracts which justify the large scale operations. The removal of Kennecott, which was shown to have been a most likely entrant, had the effect of raising the entry barriers even further, since it removed a potential entrant.[8] The Commission's finding that

8. Kennecott objects strenuously to the Commission's determination that Kennecott could have entered the industry in a way other than by internal expansion.

Kennecott intended to enter the coal industry by one means or another is supported by the evidence.

E. The Effects of the Acquisition on Competition.

■ Kennecott takes strong exception to the Commission's consideration of the anticompetitive effect of its great financial resources. The Commission reasoned that it was likely that this "deep pocket" of funds would be employed to acquire vast coal reserves and massive mining developments to enable Kennecott to compete for long-term utility supply contracts and thus to gain more market share. As we view it, this did not, as Kennecott contends, introduce a new and untried issue. It was proper for the Commission to consider the actual effect on competition of the merger of two very large corporations with their tremendous resources and to place major emphasis on this factor. The trend towards high concentration is material. Moreover, the preservation of the possibility of future deconcentration is a legitimate aim, and the inhibition of that possibility, because of the acquisition, is a relevant factor in assessing illegality. See United States

v. Continental Can Company, 378 U.S. 441, 461–462, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 365 n. 42, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

Justice Harlan in his concurring opinion in Federal Trade Commission v. Procter & Gamble Company, *supra*, recognized that the anticompetitive effects are properly to be considered. The Justice concluded that the Commission in the Procter & Gamble Clorox case was justified in concluding that the merger carried with it a reasonable probability of a substantial increase in barriers to entry and of enhancement of pricing power in the industry.

In our case it was reasonable for the Commission to conclude that Kennecott would use its immense resources to gain for Peabody, already the number one producer in the industry, an even larger share of a market which promises to be a concentrated one in a relatively short time.

We have weighed the possible effect of competing fuels, natural gas, petroleum and nuclear energy, but are of the opinion that the price competition does

---

The Commission ruled on the other hand that a finding of illegality does not depend on this; that Kennecott was admittedly a potential entrant by acquisition and that it could have entered the industry by acquiring a small company rather than the industry leader. The result, according to the Commission, was that a new competitive force was lost and the high concentration of the coal industry was accelerated.

The possibility of new rivals coming into the industry by internal expansion, or by acquisition of a firm too small to compete by itself against the largest firms, is essential to effective competition. The Report of the Attorney General's Committee (1954) states:

The basic characteristic of effective competition in the economic sense is that no one seller, and no group of sellers acting in concert, has the power to choose its level of profits by giving less and charging more. Where there is workable competition, rival sellers, whether existing competitors or new or potential entrants into the field, would keep this power in check by offering or threatening to offer effective inducements, so long as the profits to be an-

ticipated in the industry are sufficiently attractive in comparison with those in other employment, when all risks and other deterrents are taken into account. The result would be to force the seller who sought to increase his profits above this level by employing a high-price, limited-output monopoly policy either to give it up, or to lose ground to his rivals at a rate sufficient to reduce his profits, thus defeating his policy. (The inducements referred to are those of quantity, quality, time and place of delivery, incidental services, selling effort and price.)

Oppenheim, Cases on Federal Antitrust Laws 66 (2d ed. West 1959).

When a market consists of a relatively few sellers each with a significant share of a market which is isolated from such competitive pressures, there is greater possibility that the firms will not compete against each other strenuously. The preservation of the opportunity for entry of new rivals is a fundamental requisite for effective competition in the long run. *Id.* at 72–74. Added vigilance is necessary where true economies of scale permit only a relatively few sellers in the market.

not detract from our conclusion that the Commission correctly determined that it was a violation of § 7. The coal industry is a distinct submarket which has characteristics which are not shared by the other fuel industries. It has shown its ability to maintain prices at a level which allows it to compete successfully against natural gas, its closest rival. Within its own ambit, however, its price structures are now, and promise to be in the future, subject to the peculiarities of the coal business. Thus, other fuels appear to have a limited effect.

In summary we conclude:

1. The product market which is mainly directed to supplying electric utilities was and is well defined and at the same time is a somewhat structured one trending toward concentration.

2. Due to the specialized nature of the industry requiring as it does particular knowledge and highly developed equipment, the entry barriers are formidable. Lengthy effort and great resources are necessary.

3. Kennecott was prior to the merger the most likely entrant and as such exerted a substantial influence based on the likelihood of its entrance rather than on its actual competition.

4. The removal of Kennecott from the edge of the market and the substitution of it within the market for Peabody, the leading producer and distributor, eliminated a substantial potential competitive force.

5. The merger brought together the largest copper producer and the largest coal producer. The combined financial and other resources of the merging companies resulted in a merged company with a real potential to accelerate the already remarkable trend toward oligopoly.

6. "The acquisition may substantially lessen competition in the coal industry."

IX.

WHETHER KENNECOTT WAS DEPRIVED OF A FAIR HEARING

The final contention is that the Commission was in effect disqualified from extending to Kennecott a fair and judicious hearing because of varied other duties, including its numerous contacts with members of Congress and others in matters related to the very subject matter of the case. Kennecott also challenges the fairness of the hearing on the ground that Commissioner Mary Gardiner Jones refused to disqualify herself following her giving an interview to a magazine reporter.

On the first point this court pointed out in an early case, Brinkley v. Hassig, 83 F.2d 351, 357 (10th Cir. 1936), that the Federal Trade Commission combines the functions of investigator, prosecutor and judge and that Congress designed it in that manner. Thus Kennecott's complaint goes to the nature of the law itself. As to this, the courts have uniformly held that this feature does not make out an infringement of the due process clause of the Fifth Amendment. See the discussion in Federal Trade Commission v. Cinderella Career and Finishing Schools, Inc., 131 U.S.App.D.C. 331, 404 F.2d 1308, 1315 (1968). It has been pointed out, however, that a Commissioner who had previously acted in an investigatory or prosecutory capacity in a case cannot sit as a member of the Commission in deciding it. See Amos Treat & Co. v. Securities and Exchange Commission, 113 U.S.App.D.C. 100, 306 F.2d 260, 263 (1962).

In support of its contention that it could not get a fair trial, Kennecott has tendered a vast quantity of documents accompanied by a motion to supplement the record. We have examined these *in camera,* and although we see no reason why they should not be made a part of the record, with the exception of the Wier Report (Appendix XI),[9] we do not believe after reading these documents that they furnish reason in support of the Kennecott position that the cause should be reversed for unfairness. These are routine communications pertaining to Commission studies of the energy field, including coal, together with communications from congressmen and other interested groups seeking action against con-

9. Kennecott's motion to supplement the record is granted except for the mentioned report.

centration in these fields. The Commission is charged with the performance of certain public interest functions, and these documents appear to be incident to these functions. We agree with Kennecott to the extent that this places an extra burden on a Commissioner to avoid policy issues and to make a special effort to focus exclusively on the issues of the case. Undoubtedly, the Commissioners are mindful of this and are accustomed to evaluating matters before them in accordance with the issues and the evidence. The Commissioner does not, of course, enjoy any immunity because of his broad scale obligations. He must conduct himself circumspectly and with fairness and must at all times maintain the outward posture as well.

■ This brings us to Kennecott's second challenge pertaining to the public interview given by Commissioner Jones which reads as follows:

COMM. JONES. When we look at the structure of a market, we must look at the barriers to entry. We have to determine whether the acquired company could have gone into the market on its own or whether its new presence might keep others out. Perhaps it's easier to see in a case like the *Kennecott Copper-Peabody Coal complaint.* We have here an instance of a copper company that was actually moving into the coal industry on its own. Kennecott was experimenting with a small, previously acquired coal property. The *complaint says* that Kennecott, in effect, eliminated itself as a probable new entrant into the coal industry when it went out and bought a major coal company. (Emphasis added.)

The rule is that a Commissioner must be disqualified if he or she has prejudged the case or has given a reasonable appearance of having prejudged it. See Federal Trade Commission v. Cinderella Career and Finishing Schools, Inc., 131 U.S.App. D.C. 331, 404 F.2d 1308, 1315 (1968) and Texaco, Inc. v. Federal Trade Commission, 118 U.S.App.D.C. 366, 336 F.2d 754, 760 (1964).

We have examined the cases and in each instance in which the courts considering the facts have ruled that the Commissioner had to be disqualified, action was entirely justified based on comments showing what appeared to be a prejudice or a viewpoint. No such commenting or editorializing is present here. From a reading of the statement in its entirety, it is clear that Commissioner Jones was discussing the *complaint* and was doing so in an effort to illustrate a point. Thus, it does not appear that she stepped over the line, whereby she showed even a slight commitment. For this reason, we hold that the expressions do not violate the standard which is set forth in the cases. In other words, she is not shown to have prejudged the central issue of the case, namely, whether "the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly." See Skelly Oil Company v. Federal Power Commission, 375 F.2d 6 at 17–18 (10th Cir. 1967).

Effort was there being made to show that one of the Commissioners was disqualified based upon a public address. It was there said:

\* \* \* In our opinion no basis for disqualification arises from the fact or assumption that a member of an administrative agency enters a proceeding with advance views on important economic matters in issue. \* \* \* 375 F.2d at 18.

Public expressions with regard to pending cases cannot, of course, be approved because regardless of what is said such expressions tend not only to mar the image but to create embarrassment and to subject the proceedings to question. We do not, however, perceive any evidence of prejudging or the appearance of it.

The petition for review is denied, and it is directed that the orders of the Commission be affirmed and enforced.

APPENDIX

A-3921

**RX 170**

[a]

CONSOLIDATED ASSETS, SALES REVENUES AND PRODUCTION
OF COAL PRODUCERS WITH PRODUCTION OF 3,000,000 TONS OR MORE IN 1967
(RANKED BY COAL PRODUCTION)

| Tonnage Production Rank | Coal Producer | Parent Company | Total Assets | Sales Revenues | Production |
|---|---|---|---|---|---|
| | | | ------ $ Million ------ | | (1,000 tons) |
| (1) | (2) 2/ | (3) | (4) | (5) | (6) |
| 1 | Peabody 2/ | Kennecott Copper 2/ | 1,489 1/ | 757 1/ | 59,407 |
| 2 | Consolidation | Continental Oil | 2,354 | 2,083 | 56,460 |
| 3 | Island Creek | Occidental Petroleum | 779 1/ | 826 1/ | 25,880 |
| 4 | Pittston | Pittston | 299 3/ | 387 3/ | 19,681 |
| 5 | U.S. Steel | U.S. Steel | 5,606 | 4,006 | 19,010 |
| 6 | United Electric and Freeman | General Dynamics | 920 | 2,253 | 14,124 |
| 7 | Bethlehem Mines | Bethlehem Steel | 3,084 | 2,594 | 12,623 |
| 8 | Eastern Associated | Eastern Gas & Fuel | 290 | 203 | 12,339 |
| 9 | Old Ben Coal 3/ | Standard Oil of Ohio | 736 1/ | 724 1/ | 10,272 |
| 10 | Pittsburg & Midway | Gulf Oil | 6,458 | 4,202 | 8,974 |
| 11 | North American Coal | North American Coal | 45 3/ | 37 3/ | 8,692 |
| 12 | Ayrshire Collieries | Ayrshire Collieries | 94 3/ | 62 3/ | 8,604 |
| 13 | Southwestern Illinois | Southwestern Illinois | N.A. | N.A. | 7,527 |
| 14 | Westmoreland Coal | Westmoreland Coal | 35 3/ | 32 3/ | 6,337 |
| 15 | Valley Camp | Valley Camp | N.A. | N.A. | 5,487 |
| 16 | Republic Steel | Republic Steel | 1,523 | 1,266 | 4,646 |
| 17 | Jones & Laughlin Mining and Gateway Coal 4/ | Jones & Laughlin Steel | 1,093 | 904 | 4,440 4/ |
| 18 | Carbon Fuel | Carbon Fuel | N.A. | N.A. | 4,136 |
| 19 | Central Ohio and Central Appalachian | American Electric Power | 2,156 | 524 | 4,095 |
| 20 | Bell & Zoller and Zeigler Coal & Coke | Zeigler Coal & Coke | 20 3/ | 16 3/ | 4,079 |
| 21 | Winding Gulf | Winding Gulf | N.A. | N.A. | 4,067 |

[A6420]

3/69-2

A-3922
RX 170

Page 2 of 3

[b]

CONSOLIDATED ASSETS, SALES REVENUES AND PRODUCTION
OF COAL PRODUCERS WITH PRODUCTION OF 3,000,000 TONS OR MORE IN 1967
(RANKED BY COAL PRODUCTION) (CONTINUED)

| Tonnage Production Rank | Coal Producer | Parent Company | Total Assets | Sales Revenues | Production (1,000 tons) |
|---|---|---|---|---|---|
| | | | ------$ Million------ | | |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 22 | Rochester & Pittsburgh | Rochester & Pittsburgh | 42 3/ | 31 3/ | 3,863 |
| 23 | Ranger Fuel Corp. | Ranger Fuel Corp. | N.A. | N.A. | 3,451 |
| 24 | Amherst Coal | Amherst | N.A. | N.A. | 3,443 |
| 25 | Barnes & Tucker | Barnes & Tucker | N.A. | N.A. | 3,220 |
| 26 | Youghiogheny & Ohio | Youghiogheny & Ohio | N.A. | N.A. | 3,074 |

TOTAL OF PRODUCTION LISTED  317,931

TOTAL INDUSTRY PRODUCTION  552,626

TONNAGE LISTED ABOVE AS PER CENT OF TOTAL INDUSTRY PRODUCTION  57.53%

* Coverage includes bituminous, sub-bituminous and lignite, as in Bureau of Mines statistics.

N.A.: Not Available

1/ Coal company acquired in 1968. Assets and revenue figures are for combined coal company and parent company in 1967.

2/ Data obtained from corporation annual reports.

3/ As reported in Moody's Industrial Manual, 1968.

4/ Gateway Coal is owned 64.5% by Jones & Laughlin, 22.5% by Pittsburgh Steel (remaining ownership not given). Gateway leases its coal properties, but the production from them is distributed to the steel companies in proportion to their ownership interests in Gateway. Production shown is for Jones & Laughlin Mining Co. (3,021,000 tons) plus 64.5% of the production by Gateway Coal Co. (1,419,000 tons).

[A6421]

A-3923
*RX 170*

[c]

CONSOLIDATED ASSETS, SALES REVENUES AND PRODUCTION
OF COAL PRODUCERS WITH PRODUCTION OF 3,000,000 TONS OR MORE IN 1967
(RANKED BY COAL PRODUCTION) (CONTINUED)

Source: (Cols. 2, 6):   Coal Production in the United States, 1967, compiled by Keystone Coal Buyers Manual
and Coal Mine Directory (New York: McGraw-Hill, Inc., 1968).

(Cols. 3, 4, 5): "Fortune Directory of the 500 Largest U.S. Industrial Corporations," Fortune, June 15,
1968 (except as noted in footnotes).

[A6422]

## APPENDIX II

### HISTORY OF PEABODY COAL COMPANY AND THE MERGER

Prior to 1955, Peabody Coal operated principally underground mines, most of them in Illinois; as of that year, it was producing on the order of eight to nine million tons of coal per year, and running at a loss (i. e., in 1954 it lost over $1,000,-000). Its stock sold for under $3.00 per share.

In 1955, Peabody merged with a group of mines run by several related corporations, called the Sinclair group; this group had production roughly equivalent to that of Peabody at that time, but secured all its coal from strip mines and was run profitably. Merl Kelce, who was chairman and chief executive officer of Peabody until 1964, and then again from 1965 to the Kennecott merger, came into the new Peabody in 1955 from Sinclair as executive vice-president, assuming his duties as chief operating officer in 1957 upon the death of his older brother. During this period Peabody operations went from a production of 19 million tons to one of over 60 million tons; its stock price went from under $3.00 per share to over $47.00 per share, and it became one of the two largest coal companies in the country. Mr. Kelce attributed this principally to the growth in demand for coal by utilities, coupled with his practice of acquiring all reserves he could and closing down underground mines in favor of strip operations (there is currently only one underground mine left in the Peabody structure).

Mr. Kelce outlined the difficulties the company faced in the 1950's and 1960's in getting capable young men to enter the coal business, which everyone assumed to be moribund; he also stated that he encountered considerable opposition to and derision regarding his policy of putting all available funds into acquisition of reserves, which everyone assured him he would never be able to use. He wished he had been able to acquire more reserves, but felt the supply achieved to be adequate; on the other hand, the shortage of capable executives he felt to be a most serious problem for the company and for the industry in general.

Mr. Kelce resigned from Peabody in 1964, but reassumed his post as chairman and chief executive officer somewhat reluctantly in 1965. One of his thoughts at that time was to secure the sale of Peabody, and he let it be known that the company was for sale, conducting several negotiations to that end over the next few years. When asked why he wished to sell Peabody (the Kelce family had the largest share of stock in the company by a wide margin; although it was in itself fairly small—15 percent roughly —it gave the family effective control), he responded thus:

A. There were several reasons: air pollution, the threat of nuclear power, and our share price had been going down. When I made the agreement with Milliken of Kennecott, I think our shares were less than $30.

He explained each of the above considerations: air pollution was a considerable worry, not for the expense of developing clean-up technology but because there was considerable talk of the government's limiting the permissible use of coal to that having a sulphur content of one percent or less. This would have been a severe blow to Peabody, for just about all the coal it mined was "in the high range" of three and one-half to four percent sulphur content.

The nuclear power problem arose particularly from the fact that Peabody's two largest customers, Commonwealth Edison of Chicago and the TVA, both told Peabody that they were planning to make substantial investments in nuclear power—from which, they said, they could secure fuel costs which Mr. Kelce testified were "substantially lower than we had been delivering coal for"—and then went ahead and made some actual investments therein. Sales to these two com-

panies accounted for up to 40 percent of Peabody's production.[1]

The significance of the decline in price of Peabody's stock—which Mr. Kelce attributed principally to investor worry about pollution and nuclear power, as earnings remained high and even increased—was explained by him thus:

Q. At that time—and I am now talking about '65—'66—were these people you gave stock to when you opened mines back in your early days still shareholders of the company?

A. They had sold some of it, but the majority of them had held their stock.

Q. Was consideration for the investments of those people any factor in your decision to sell the company?

A. Well, my older brother had had a heart attack. Then other shareholders who had gotten stock through the old Sinclair Coal Company had come to me and said, "Well, why don't you sell the company?" Then, myself, I had gotten to the point where I wasn't a young man any more. I quit once, and then I came back into the business. I didn't want to have to spend as much time as I had been spending in the business running Peabody Coal Company.

Mr. Kelce had seriously discussed sale of Peabody with the Cerro Corporation, with Texas Gas Transmission of Owensboro, Kentucky, with Sunray DX Oil Co. of Tulsa, and with Atlantic Richfield of Philadelphia. He had also discussed things informally with Dean McGee of Kerr-McGee, but did not feel that to have been on the same level as negotiations with the other companies.

Finally, Mr. Kelce testified that the entrance of the oil companies into the coal business had had an adverse effect on Peabody:

A. After the oil companies got in, it was pretty difficult for a company like Peabody, with a limited amount of cash, to go in and compete. Prices went up two and three times what we had been paying. (A–1825)

The first direct contact anyone from Peabody had with anyone from Kennecott took place in April of 1966, when Kelce, Jim Taylor (former general counsel of Peabody) and Harry Burgess (vice-president of Kennecott) got together following Peabody's annual meeting. This meeting was set up following a contact made by Paul Weir to Kelce between two and three weeks earlier. At this meeting, Kelce confirmed to Burgess that Peabody was for sale, and Burgess so reported to Milliken, Kennecott's president.

In this regard, there is a memorandum from Burgess to Milliken dated March 24, 1966, regarding a conversation between Burgess and Paul Weir and one Clayton Ball, an associate of Paul Weir. The Paul Weir Company is a consulting operation which is in the business of locating executives and generally helping make contacts and expediting the flow of information in industry; Kennecott has used them frequently.

The memorandum states that the subject of the conversation was specifically "coal opportunities", and says that both Weir and Ball stressed the dearth of much in the way of currently exploitable coal reserves to be bought from scratch, and the non-advisability of going after "cats and dogs" of companies in any effort to get into the coal business. It then states that Weir mentioned that if Kennecott were interested in "going overboard" it might consider Peabody, which might be for sale. Burgess concludes the memo by stating that he told Weir—who is described as a good friend of Kelce—to ask Kelce if he might be interested in working something out, and appends a few sketchy facts about Peabody (gross sales, net profits, estimated reserves, and a brief comparison to Consolidated Coal, then being acquired by

1. The full advent of nuclear power on the scene has been delayed, and both TVA and Commonwealth Edison have since brought coal-burning plants. The potential still remains, of course.

**86**

Continental Oil). The memo is dated some three weeks before the meeting between Burgess and Kelce.

Following that latter meeting, merger negotiations began in earnest; Kennecott's Board was advised three months later, in July of 1966, of the state of affairs, and was asked for its approval to carry on negotiations to conclusion. Enclosed with that request was a rather detailed report on Peabody and the coal industry in general, as well as Kennecott's embarrassment of then-current riches. The report predicts that in the long run the acquisition will materially increase Kennecott's assets and the stockholders' equity over what they could be expected to be in the same period without the acquisition. The report anticipates a rosy future for the coal industry, and never mentions Knight Ideal.

In all events, the Kennecott Board approved continued negotiations at its meeting on July 15, 1966, and the acquisition was consummated on March 29, 1968.